S12A0833. LEGER v. THE STATE.
(732 SE2d 53)

HINES, Justice.

Donavon Shane Leger ("Leger") appeals his convictions for mal-

ice murder and aggravated battery in connection with the death of his estranged wife, Tracy Leger ("Tracy").[1] For the reasons that follow, we affirm.

Construed to support the verdicts, the evidence showed that on the night of her death, Tracy left the home she shared with her brother, David Bumbalough, leaving her nine-year-old son with Bumbalough while she visited Brooks, a male friend with whom she was romantically involved. During that evening, Leger telephoned Tracy's house six to ten times; his speech was slurred and he sounded intoxicated. Tracy called Bumbalough and said that Leger had called her cell phone 40 times, and that she was going to turn the cell phone off; she suggested that Bumbalough take the house phone off its hook as well. Tracy also said that she would return home shortly.

The next morning, Bumbalough helped Tracy's son get ready for school and get on the school bus. Bumbalough then saw Tracy's vehicle behind the house; he discovered her body lying near the vehicle. There were 183 knife wounds on her body, including a number of defensive wounds and wounds that had been inflicted after death. Tracy died of a cut to her jugular vein.

During their relationship, Leger had often been abusive toward Tracy; he choked, punched, and kicked her, had thrown her on a bed, and pushed her across a room. He was possessive and jealous, and unhappy that Tracy began a romantic relationship with Brooks after she separated from him. He threatened to kill her, she was scared of him, and Bumbalough moved into her house due to that fear.

1. The evidence authorized the jury to find Leger guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Leger opted to invoke the reciprocal rules of discovery under OCGA § 17-16-1 et seq. He contends that in three instances the State violated the requirements of the reciprocal discovery rules and that this should have resulted in the exclusion of the evidence at issue.

---

[1] The crimes occurred on September 6, 2004. On November 19, 2004, a Cobb County grand jury indicted Leger for malice murder, felony murder while in the commission of aggravated battery, felony murder while in the commission of aggravated assault, aggravated battery, and aggravated assault. Leger was tried before a jury November 5-14, 2007, and found guilty on all charges. On November 15, 2007, he was sentenced to a term of life in prison for malice murder, and a consecutive term of 20 years in prison for aggravated battery; the remaining counts either merged with the malice murder or were vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4), (5) (434 SE2d 479) (1993). Leger filed a motion for new trial on November 15, 2007, which he amended on September 3, 2010, and amended again on November 5, 2010; the motion for new trial, as amended, was denied on January 6, 2011. Leger filed a notice of appeal on January 20, 2011. His appeal was docketed in this Court for the April 2012 term, and orally argued on April 16, 2012.

In urging that the only appropriate remedy in each instance was the exclusion of the evidence, Leger particularly relies upon OCGA § 17-16-6, which reads:

> If at any time during the course of the proceedings it is brought to the attention of the court that the state has failed to comply with the requirements of this article, the court may order the state to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the state from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances. If at any time during the course of the proceedings it is brought to the attention of the court that the defendant has failed to comply with the requirements of this article, the court may order the defendant to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the defendant from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances. The court may specify the time, place, and manner of making the discovery, inspection, and interview and may prescribe such terms and conditions as are just.

However,

> [i]n enacting this statute, the legislature did not impose a rigid formulation or grant an exclusive remedy for a defendant or a fatal consequence to the State for failure to comply with the discovery mandates. Instead, it cloaked the trial court with the discretion to use its own judgment to ensure a fair trial. Thus, the remedy a trial court fashions to cure a discovery violation is reviewed on appeal only for abuse of discretion.

*Jones v. State*, 290 Ga. 576, 577-578 (2) (722 SE2d 853) (2012) (Citation and punctuation omitted). Exclusion of evidence "is a particularly harsh sanction and should be imposed only where there is a showing of prejudice to the defense and bad faith by the State." *Higuera-Hernandez v. State*, 289 Ga. 553, 557-558 (3) (714 SE2d 236) (2011) (Citation and punctuation omitted).

(a) Five days before the start of the trial, the State delivered to defense counsel a copy of a report showing DNA test results from the cap that was found at the crime scene. The predominant DNA found inside the cap matched Leger's DNA profile. Such a report is to be provided ten days prior to trial, unless otherwise ordered by the court.[2] See OCGA § 17-16-4 (a) (4). The prosecuting attorney stated that, although the report had been prepared at least eleven months earlier, it had only been delivered to the prosecution minutes before it was in turn delivered to the defense; in the meantime, it had been in the hands of a laboratory operated by the Federal Bureau of Investigation. That this evidence had been collected and sent to the laboratory was timely disclosed to the defense. Leger asserts that the late disclosure of the DNA match greatly prejudiced his defense in that, before the test result was made available, his defense strategy was to argue that the State's evidence simply did not place him at the scene of the crimes.

Leger did not seek a continuance or request any other remedy authorized by OCGA § 17-16-6, except the complete exclusion of the DNA evidence. Further, he does not articulate what prejudice he suffered that would have been cured by his having been provided with the report five days earlier, as contemplated in OCGA § 17-16-4 (a) (4). In any event, "the severe sanction of exclusion of evidence applies only where there has been a showing of bad faith by the State *and* prejudice to the defense. [Cits.]" *Cockrell v. State*, 281 Ga. 536, 539 (3) (640 SE2d 262) (2007) (Emphasis in original). At trial, the court specifically stated that the State could not have provided the defense with the report sooner than it did, and Leger did not show, either at trial or by his motion for new trial, that this was incorrect. Under these circumstances, there was no abuse of the court's discretion allowing the DNA evidence to be admitted into evidence.

(b) In timely discovery, the State advised the defense that a witness from Leger's cell phone provider would testify regarding cell phone data; however, the witness who testified at trial was not named until the time of trial, nor were the demonstrative exhibits which that witness used in his testimony revealed until that time. Discovery materials timely provided to Leger's attorney before trial showed times of use and locations of cell phone towers utilized by Leger's telephone calls prior to and after the killing; the evidence prepared by the witness from that information, which was not made available until trial, used triangulation methods to place Leger near the scene

---

[2] There was no such order.

of the crimes with more specific accuracy.[3] Although Leger again did not request a continuance, he was given time to interview the witness, and does not argue that the time was insufficient. Indeed, at one point counsel stated that he needed only another ten minutes with the witness, or "maybe five"; the time was afforded.

Again, the only remedy Leger pursued at trial was exclusion of the evidence. "It is usually a sufficient remedy for the defense to be afforded an opportunity to interview the witness." *Norris v. State*, 289 Ga. 154, 156 (2) (709 SE2d 792) (2011) (Citation and punctuation omitted). As Leger had been provided the data from which the demonstrative exhibits were created, and was afforded time to interview the witness, it does not appear that the trial court abused its discretion in denying the request to exclude the witness from testifying and the admission of the evidence. Id.

(c) In addition to the cell phone witness, six other witnesses were not identified on the witness list provided to Leger ten days before trial. However, each of them was identified elsewhere in discovery materials which were timely provided to Leger. This Court has held that

> [w]hen the identity and involvement of a witness are otherwise disclosed to defendant in discovery provided to him by the State, the purpose of the witness list rule is served and the court may allow the State to call the witness even though he or she was not listed on the State's formal witness list.

*Norris*, supra at 155 (Citation omitted). Again, Leger sought no remedy other than the witnesses being prevented from testifying, and no error is shown.

3. Leger contends that the trial court should have excluded the testimony of four witnesses regarding prior difficulties between Leger and Tracy, contending that their testimony was inadmissible hearsay.

> Prior difficulty evidence may be admitted to show motive, intent, or bent of mind, but its admissibility is not dependent on a showing that it is sufficiently similar to the crime. The testimony of third parties about prior difficulties between the defendant and the victim may be admitted into evidence under the necessity exception to the hearsay rule if the

---

[3] The demonstrative charts the witness used to aid his testimony have not been included in the record on appeal.

testimony is necessary and trustworthy and when the statement is more probative of the material fact than other evidence that may be produced and offered. Whether the testimony has particularized guarantees of trustworthiness is a matter left to the trial court's discretion and is not disturbed absent a showing of an abuse of that discretion.

*Wright v. State*, 285 Ga. 57, 59-60 (3) (673 SE2d 249) (2009) (Citations and punctuation omitted).

At a motion in limine hearing, Leger raised the issue of hearsay in regard to witnesses who would testify about prior difficulties between Leger and Tracy, and the court stated that when questioning of the witnesses reached that point, Leger could raise his objection about "hearsay and the reliability," and that he would be given an opportunity to voir dire the witnesses. See *Jeffers v. State*, 290 Ga. 311, 315 (4) (c) (721 SE2d 86) (2012). As to each of the four witnesses, Leger raised an objection, stating that the questioning called for hearsay, and argues in this Court that particularized guarantees of trustworthiness were not shown.[4]

(a) Bumbalough testified that in April 2004, Tracy told him that, at the wedding of Leger's sister, Leger had beaten Tracy severely, and that their marriage was over; Tracy related this while in the hospital for treatment of the injuries she received in that beating. At trial, Leger argued that the statement was not admissible under the necessity exception to hearsay testimony in that the statement was unreliable, because at the time she related the incident to Bumbalough, Tracy had been arrested for driving while under the influence of alcohol and was presumably intoxicated. He now contends that the statement should have been excluded because there was no showing of a close enough relationship between the brother and sister to exhibit particularized guarantees of trustworthiness. See *McNaughton v. State*, 290 Ga. 894, 898 (3) (a) (725 SE2d 590) (2012). However, the evidence was that Tracy turned to Bumbalough for help with her problems, particularly those in regard to Leger, even asking him to move in with her after the beating, and there was no error in admitting the statement into evidence. Id. See also *Evans v. State*, 288 Ga. 571, 572-573 (2) (707 SE2d 353) (2011); *Azizi v. State*, 270 Ga. 709, 711 (2) (a) (512 SE2d 622) (1999).

(b) Tracy was hired at her place of employment by Brooks, two years before her death. Brooks testified that for most of that time,

---

[4] The statements at issue were not testimonial in nature, and are not subject to an analysis under *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004).

although he was her boss, he and Tracy were friends; they became physically intimate about three months before Tracy was killed. During the period when the relationship was that of friends, before any physical intimacy took place, Brooks overheard numerous telephone conversations between Tracy and Leger in which Leger could be heard screaming in the background, and Tracy attempted to avoid telephone calls from Leger, including asking that calls from him that came on the business telephone not be relayed to her. Tracy told Brooks that she would be attending a wedding the next weekend; at work the following Monday, Tracy was badly bruised on the face, arms, and legs such that her appearance precluded her being able to be sent out to meet with business clients.

After Brooks and Tracy became physically intimate, a man telephoned Brooks using Tracy's cell phone and asked if Brooks was sleeping with the man's wife; Brooks denied it. In the background, Brooks could hear Tracy's voice screaming, asking the man to stop, and saying that the man was hurting her; she called the man "Donavon." The next day, Brooks observed a large bruise on Tracy's wrist, and Tracy told Brooks that the man on the phone was Leger. On a later date, Brooks telephoned Tracy on her cell phone and could hear the same man's voice in the background, questioning Tracy about the nature of the telephone call; he also heard sounds of a struggle. Again, Brooks later observed Tracy with bruises.

Noting that Tracy and Brooks were engaged in a meretricious relationship while Tracy and Leger were still married, Leger contends that Brooks's evidence should have been excluded because "[a] 'married person's complaints about that person's spouse, made to one with whom the married person is conducting an adulterous affair, are subject to the possibility of exaggeration if not outright falsehood.' [Cit.]" *Azizi*, supra at 712 (2) (b). However, this ignores the fact that much of what Brooks testified to under the necessity exception occurred when he and Tracy were merely friends, before the physically intimate relationship began. Id. at 712 (2) (a). Also, generally, the statements to which Brooks testified were part of spontaneous exchanges between Tracy and Brooks, Tracy had no reason to lie to him about them, and her statements about the altercations were corroborated by her visible injuries. See *McNaughton*, supra at 899. We find no abuse of discretion in admitting this testimony.

(c) Leger also objected to testimony of Tracy's supervisor, Butler, who testified that Tracy stated that Leger was physically abusive, that Butler saw signs of abuse on her person, and that after an altercation with Leger at a wedding, Tracy was upset and stated that she wanted to get away from Leger. Butler also related that on another occasion, Butler asked Tracy why she did not leave Leger,

and she said: "I feel if I leave, he'll kill me." Butler testified that he knew Tracy for a year-and-a-half, their relationship was good, she confided in him about important things in her life such as her relationship with Leger, and that her statements about Leger and their relationship were consistent over time. There was no error in admitting Butler's testimony. *Evans*, supra. See also *McNaughton*, supra.

(d) Another supervisor of Tracy's, Force, testified that Tracy told him that Leger was abusive, that she asked him to have telephone calls from Leger blocked on the business telephone, and that she hoped to end the marriage. We agree with Leger that the evidence regarding Force's relationship with Tracy, which was only that of supervisor and employee, was insufficient to establish the particularized guarantees of trustworthiness so as to permit the admission of this testimony under the necessity exception to the hearsay rule. *Brooks v. State*, 281 Ga. 514, 517-518 (4) (640 SE2d 280) (2007). However, the evidence at issue was cumulative of evidence properly admitted, and the erroneous admission of this evidence was harmless. Id. See also *McNaughton*, supra at 900.

4. Leger complains that, over objection, the State was allowed to introduce certain irrelevant evidence that impermissibly placed his character into issue. He first cites the introduction of a book titled *"FUGITIVE: How to Run, Hide, and Survive"*; when a search warrant of Leger's home was executed the day after Tracy was killed, the book was found open, face down on a table. But there was no error in admitting it, or the photographs of it on the table. Evidence of flight is relevant to the question of guilt, see *Evans*, supra at 574-575 (5), and evidence of a suspect's plan to flee is germane to that question. See *Semple v. State*, 271 Ga. 416, 417 (1) (519 SE2d 912) (1999). The fact that the evidence of contemplated flight was in a medium that was published and generally available to the public did not render it irrelevant to Leger's state of mind and plan to flee. See *Beasley v. State*, 269 Ga. 620, 622 (2) (502 SE2d 235) (1998).

Leger also objected to the introduction of a photograph taken of him after trial had begun, pursuant to a search warrant. It depicted his chest, upon which there was a tattoo reading: "God Forgive Me." Leger acquired the tattoo between the time Tracy was killed and the time of trial.

Evidence regarding a tattoo is not inadmissible per se. See *Carruthers v. State*, 272 Ga. 306, 315 (10) (528 SE2d 217) (2000) (Evidence of tattoo admitted for identification purposes), overruled on other grounds, *Vergara v. State*, 283 Ga. 175, 177 (1) (657 SE2d 863) (2008); *Allen v. State*, 272 Ga. 513, 515 (4) (530 SE2d 186) (2000) (Evidence of tattoo properly admitted as evidence of motive). Rather,

"[a]ny statement or conduct of a person, indicating a consciousness of guilt, where such person is, at the time or thereafter, charged with or suspected of crime, is admissible against him upon his trial for committing it." *Bridges v. State*, 246 Ga. 323, 324 (2) (271 SE2d 471) (1980) (Citations, punctuation and emphasis omitted). Compare *Belmar v. State*, 279 Ga. 795, 798-799 (3) (621 SE2d 441) (2005), in which a tattoo reading "12 gauge" was improperly introduced to support a theory that the defendant had a "propensity" to use a 12-gauge shotgun. The tattoo at issue was properly admitted as evidence of consciousness of guilt.

5. Craig testified regarding the DNA evidence linking Leger to the cap found near Tracy's body. Leger argues that, because Craig did not physically perform all of the steps in the testing of the DNA sample and cap, her testimony violated his right to confront the witnesses against him under the Sixth Amendment to the Constitution of the United States. However, his argument is unavailing.

Regarding her functions at the laboratory, Craig testified:

> I am the supervisor of a case. Evidence is submitted and I review the evidence, decide what I am going to test and then direct biologists to do the testing, to do the sampling and they provide me the data. I interpret the results, I write a report, and I testify in court.

As to this particular test, she selected the specific stains which were to undergo further DNA testing. She was then presented with the data from the testing, interpreted the data, and wrote the report. She did not "cut the samples and put them in the tubes and add the chemicals." She testified about the laboratory's reliability procedures and noted that another examiner reviewed her interpretations; no certified DNA report was actually admitted into evidence.

This Court has previously held that a supervisor of such testing can testify without offending the confrontation clause. *Disharoon v. State*, 291 Ga. 45 (727 SE2d 465) (2012). As we noted in that case, the courts of this State have "consistently held that the Confrontation Clause does not require the analyst who actually completed the forensic testing used against a defendant to testify at trial. [Cit.]" Id. at 46. And, we also noted that the United States Supreme Court had then recently rejected the practice of "surrogate testimony," and held that the admission of testimony of a "scientist who did not sign the certification or perform or observe the test" would be a violation of the Confrontation Clause. Id. at 47, citing *Bullcoming v. New Mexico*, ___ U. S. ___ (131 SC 2705, 2710, 180 LE2d 610) (2011).

The witness testimony approved in *Disharoon* is similar to that of Craig in terms of her connection to the DNA testing performed here; Craig was the supervisor of the testing, had significant personal connection to the test (having selected the stains to be analyzed), interpreted the data, performed the statistical analysis, and prepared the test report. The errors present in *Bullcoming* did not occur in this case, and Craig's testimony did not run afoul of that precedent.[5]

*Judgments affirmed. All the Justices concur.*

DECIDED OCTOBER 1, 2012.

*H. Maddox Kilgore*, for appellant.

*Patrick H. Head, District Attorney, John R. Edwards, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine L. Iannuzzi, Assistant Attorney General*, for appellee.

---

[5] Nor does more recent treatment of the issue by the United States Supreme Court change our conclusion that Craig's testimony did not violate the Confrontation Clause. In *Williams v. Illinois*, ___ U. S. ___ (132 SC 2221, 183 LE2d 89) (2012), no single opinion was adopted by a majority of the Court. However, a four-member plurality of the Court determined that, when an expert testified to her conclusion based upon a DNA report prepared by a contract laboratory that she neither supervised nor observed conduct the specific test, the Confrontation Clause was not violated, although the two grounds on which the plurality relied do not apply to this case. And, a fifth Justice reached the same conclusion as the plurality, although on different reasoning. Accordingly, although it may not be possible to definitively state the Court's prevailing view on this issue, the Court's opinion in *Williams* does not appear to affect the approach we recently took in *Disharoon* and follow today.