**FIRST DIVISION**
**DOYLE, C. J.,**
**ANDREWS, P. J., and RAY, J.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**July 7, 2016**

# In the Court of Appeals of Georgia

A16A0063. MOCERI v. THE STATE.

ANDREWS, Presiding Judge.

Dominic Joseph Moceri, III appeals from the judgment of conviction and sentence entered on a jury verdict finding him guilty of homicide by vehicle in the first degree. For the following reasons, we affirm.

1. A jury found Moceri guilty of first degree vehicular homicide in violation of OCGA § 40-6-393 (a) based on evidence that he caused the death of the passenger in the car he was driving when he crashed the car into a utility pole while fleeing and attempting to elude a pursuing police vehicle in violation of OCGA § 40-6-395 (a).

On November 4, 2007, Officer Baird, a uniformed police officer employed by the Athens-Clarke County Police Department was on patrol in his marked police vehicle at 1:20 a.m. when he observed a BMW automobile traveling about 46 miles

per hour in a 35 miles per hour speed zone while drifting from side to side within the traffic lane. As the car went through a curve in the road, the officer observed the car drift in one direction and then correct in the other direction with a "quick jerk." When the speed limit on the road changed to 40 miles per hour, the car accelerated to 55 miles per hour. Based on the fact that the car continued to drift back and forth within the lane and the speed of the car, the officer was concerned the driver may be impaired and followed the car, with the police vehicle's video camera activated, to observe how the car was being driven. As the car approached an intersection with another road, the officer activated his vehicle's blue lights to stop the car to investigate whether the driver was impaired. At that point, the car changed to the right turn lane and turned right at the intersection. The officer followed the car with blue lights activated as the car drove ahead and passed several businesses where the driver could have safely stopped the car. Another police officer (Officer Bennett) traveling in a marked vehicle, saw Officer Baird with blue lights activated following the car and pulled in behind Officer Baird with the intention of driving by the traffic stop. Officer Bennet confirmed that, as Officer Baird followed, the car continued past locations where the driver could have safely stopped. Officer Baird testified that he blew his air horn to give the driver an audible stop signal in addition to the blue

2

lights, and that, when he did so, "instead of pulling over to the right hand side of the road[, the car] accelerate[d] rapidly and began to separate from me." Officer Bennett also testified that, when Officer Baird "bump[ed] his air horn . . . [she] saw the BMW take off at a high rate of speed." Seconds later, with Officer Baird in pursuit, the car failed to negotiate a sharp curve in the road and crashed into a utility pole. The entire sequence of events, including the car's high-speed acceleration away from the police vehicle and the subsequent crash, was captured on Officer Baird's video camera and was viewed by the jury. At the crash scene, Officer Baird immediately called for an ambulance, exited his vehicle, and identified two people as occupants of the car – Moceri, who was the driver of the car, and a female passenger. The passenger side of the car was heavily damaged in the crash, and the passenger, who was not breathing and had no pulse at the scene, was taken by ambulance to a hospital. On arrival at the hospital emergency room, the passenger was declared dead. Evidence showed that the passenger died as a result of multiple injuries she suffered in the crash. Although Moceri insisted he was not injured, he was also taken to the hospital to be examined. At the scene of the crash, Moceri denied drinking any alcohol, but a blood test at the hospital showed that he had a blood alcohol level of .059, below the legal limit of .080. A nurse who helped examine Moceri at the hospital shortly after the crash said

3

that he was "laughing off the police," claimed he had been a race car driver, and said, "I should have been able to get away."

There was ample evidence to support the jury's determination that Moceri was guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Moceri claims the trial court erred by excluding evidence that the 1995 BMW M3 car he was driving had a possible mechanical malfunction which he contends caused or contributed to the fatal crash. The trial court entered a pre-trial order excluding the evidence based on findings that the defendant violated provisions of the Criminal Procedure Discovery Act (the Discovery Act or the Act) (OCGA § 17-16-1 et seq.) by failing to preserve the car for inspection by the state as ordered by the court; that the defendant's failure was in bad faith; and that the state was prejudiced. OCGA § 17-16-6.

It is undisputed that the defendant elected to have the Discovery Act apply to his case, and therefore the reciprocal discovery obligations in the Act applied to the prosecution and the defense. OCGA § 17-16-2 (a). Where the prosecution or the defense fails to comply with discovery obligations in the Act, the trial court has broad discretion to fashion a remedy to ensure a fair trial. *Leger v. State*, 291 Ga. 584, 586

4

(732 SE2d 53) (2012). "[T]he remedy a trial court fashions to cure a discovery violation is reviewed on appeal only for abuse of discretion." *Jones v. State*, 290 Ga. 576, 578 (722 SE2d 853) (2012). Moreover, if the defendant fails to comply with a discovery obligation in the Act, the trial court

> may order the defendant to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the defendant from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances.

OCGA § 17-16-6 (emphasis supplied).

The record shows the following procedural history leading to the court's order pursuant to OCGA § 17-16-6 prohibiting the defense from introducing evidence of mechanical malfunction. After new defense counsel was substituted in March 2009, the case was set for a June 24, 2009 calendar call during which a discussion occurred as to whether the defendant intended to use expert testimony to assert a claim that there was a mechanical malfunction of the car. After defense counsel stated that a malfunction claim was under consideration, the court ordered pursuant to OCGA §§ 17-16-4 and 17-16-8 that, before July 31, 2009, all discovery disclosures related to expert evidence in support of the claim be made and witness lists be exchanged. The defense failed to comply with the court order. At the July 31, 2009 calendar call,

5

defense counsel announced ready for trial and stated that the defense would comply with the court order and provide the discovery to the state in one day. Based on that assurance, the trial court set the case for a status conference on September 4, 2009 and for trial on September 28, 2009. The record at the September 4 status conference shows the defense failed to timely comply with the court's prior discovery order. The defense provided the state with: (1) (on August 14, 2009) a witness list which included the names of two persons the defense expected to use as expert witnesses (though not identified as experts on the list); (2) (on September 2, 2009) a certified copy of BMW recall campaign 97V131 (issued by the National Highway Traffic Safety Administration) listing various BMW cars, including 1995 BMW M3 cars; and (3) (on September 3, 2009) written summaries of oral reports given to the defense by two expert witnesses. Defense counsel informed the court that the summaries were given because the experts did not provide written reports. The summaries provided by the defense consisted of only a general statement that the BMW recall 97V131 applied to the BMW M3 car driven by the defendant, and that the problem referenced in the recall affected the car and made it difficult to control as it relates to accelerating and stopping. The state asked for an opportunity to inspect the car, and the following colloquy ensued between the court and defense counsel:

6

> Court: So . . . the experts . . . all they're going to testify about is this recall?
> Counsel: That is correct . . .
> Court: [D]id the experts inspect the vehicle?
> Counsel: That is correct.
> Court: Where is the vehicle?
> Counsel: I do not know . . .
> Court: Well, you need to find that out. . . . [I]f [the state] needs to go and inspect it – this is not going to be a trial by ambush. . . . [W]hen did these [experts] inspect the vehicle?

Defense counsel responded that one expert inspected the car "a long time ago" and that the other expert had been "involved in this case for about six months." When the court asked defense counsel why the defendant had not complied with the court's order to disclose the expert information before July 31, defense counsel responded, "[W]e were still making decisions as related to strategy on the case is the reason." The court temporarily recessed the status conference and told defense counsel to find out where the car was located and report back. When defense counsel reported back, he provided an address in Oxford, Georgia as the location of the car. According to defense counsel, he was "just provided that on the phone by the owner of the vehicle," who counsel identified as the defendant's father, a Michigan resident. The state asked the court for a continuance to give it an opportunity to obtain an expert to examine the car for the purpose of responding to the defense experts. Defense

7

counsel argued that the state was not entitled to a continuance or any other relief because the state had possession of the car after the November 2007 accident, conducted a Georgia State Patrol accident investigation, and should have inspected the car when it had possession to determine if the recall had a bearing on the crash before releasing the car to the owner in April 2008. Pursuant to the state's request, the court: (1) continued the case from the September 28 trial date; (2) ordered the defense no later than September 9, 2009 to provide the state with expanded written statements of the experts' oral reports which provide all the relevant and material portions of the reports in compliance with OCGA § 17-16-4 (b) (2); and (3) ordered the defendant pursuant to OCGA § 17-16-4 (b) (1) to preserve the car in its current condition – that it "shall not be changed, altered, or modified in any way and shall not be destroyed" – and to make the car available to the state for inspection. The court specifically asked defense counsel if there was any objection to the court's order that the defendant preserve the car for inspection. Defense counsel responded, "[N]o, Your Honor, it has been preserved for this reason. I mean, that's the whole reason it has been saved for this time." At the next status conference on October 9, 2009, defense counsel informed the court that the defense anticipated contacting additional experts to inspect the car and that the car was available for inspection. On December 1, 2009,

8

the state contacted the defense to arrange for its expert to inspect the car, and the state's inspection was set for December 17, 2009. But on December 14, 2009, defense counsel informed the state that the car was missing and was not available for inspection. Based on the failure of the defendant to preserve the car in compliance with the court order, and the state's inability to inspect the car to respond to the defense experts, the state moved pursuant to OCGA § 17-16-6 for the trial court to prohibit the defendant from introducing evidence that the car had a possible mechanical malfunction caused by problems referenced in the BMW recall 97V131. At the January 22, 2010 calendar call, the trial court addressed the missing car and the state's exclusion motion, and noted that defense counsel informed the court at the hearing on September 4 that the defendant's father owned the car. Defense counsel told the court that, after the court's September 4, 2009 oral order to preserve the car was reduced to writing on September 9, 2009, he spoke to the defendant's father to explain the court's order, and the father told him the car had been transferred to someone else. Defense counsel told the court that on September 9 he drove to the location where the new owner kept the car, and that he had previously revealed the transfer of ownership in a motion filed on September 28, 2009. The record shows that on September 28 defense counsel filed a document captioned "Motion to Accept

9

Discovery as Timely Filed" asking the court to accept the untimely filing of the expanded written statement of an expert's oral report. The second to last paragraph in the motion, totally unrelated to the motion, contained the following statements:

> After court appearances on September 9, 2009, Counsel for Defendant drove to the location of the automobile that is the subject of the investigation of this case. Counsel drove to Oxford, Georgia, to personally notify the owner of the storage facility that the automobile cannot be altered in any way pursuant to Honorable David Sweat. Prior to this, Counsel had learned that the owner of the facility where the automobile is being stored is now the owner of the automobile, and Counsel wanted to make sure that the new owner understood the Court's Order.

The trial court scheduled an evidentiary hearing to consider the state's motion to exclude evidence.

The record contains a defense proffer of the excluded evidence describing the possible mechanical malfunction at issue as set forth in the BMW recall 97V131. As described in the recall, if the plastic bushing on the car's cruise control or throttle cable breaks (due to environmental influences coupled with vibration), then during application of the gas pedal (without cruise control engaged) this could cause the throttle valve to remain partially open, "and the car might not decelerate as expected when you release the gas pedal." The recall states that the repair necessary to prevent this potential mechanical malfunction is the installation of a "spring steel clip" on

each cable. The defendant's proffer showed that his experts were expected to testify that, as a result of the problems described in the BMW recall, cars subject to the recall could also experience another potential mechanical malfunction not described anywhere in the recall – the car could suddenly accelerate without any application of the gas pedal by the driver. The defendant's experts and other witnesses were also expected to testify that the recall applied to his BMW M3; that, when they inspected the car after the accident, the car did not have the "spring steel clips" installed to repair the potential malfunction; and that the absence of the clips could have caused or contributed to the crash.

The evidence produced at the hearing on the state's motion to exclude the mechanical malfunction evidence showed the following: At some point before the end of March 2009, Raphael Sicheron, a mechanic who owns an automobile repair shop in Oxford, Georgia, inspected the car on two different occasions at the request of the defendant's father (the car's owner) at the location where the car was stored by the father in Athens, Georgia. Sicheron was the defendant's former co-worker at a Hyundai dealership in Athens. Sicheron said that he was aware the car had been in an accident, and that in the first inspection he identified a broken part on the car's throttle cable and showed it to the defendant's father. At the second inspection, the

11

defendant's father asked Sicheron to show an investigator what he had seen in the first inspection. Sicheron showed the investigator the car's gas and cruise control cables and the broken part, and the investigator took pictures of what he showed her. Later in the hearing, defense counsel informed the trial court that the investigator who took the photographs was employed by his office. Sicheron said the defendant's father spoke to him about giving an expert opinion to support the malfunction claim. In June 2009, the defendant's father sold the car to Sicheron for $300, but the car remained in the father's possession where it was stored in Athens. Sicheron bought the car for a customer and friend, Ronald James, with the intention to remove the engine from the car and install it in a vehicle owned by James. Sicheron had earlier discussions about buying the car for the engine, but he was told by the defendant or the defendant's father that the car was not available because it was the subject of an investigation. But sometime after March 2009, they told Sicheron the car was available. James paid $500 to Sicheron to purchase the car for the engine. According to James, the engine in the car was worth $3,000 to $4,000, and he did not know why the car was sold for less, but "[i]t was a good deal." Sicheron eventually took possession of the car from the defendant's father, and he and James transported it from Athens to Sicheron's repair shop in Oxford in July or August of 2009. To

12

remove the car from the secure storage facility where the defendant's father had stored it required the father's signature. Sicheron continued to speak with the defendant's father on the phone every week because he hoped to do business with the father, who produces turbochargers. After Sicheron and James transported the car to Oxford, Sicheron put the car adjacent to his shop in a location with no security. He said the defendant's father told him to hold off for a while on doing anything to the car because the lawyer needed to have investigators look at the car. Defense investigators later came to Sicheron's repair shop in Oxford to look at the car. Although he could not remember the date, possibly on September 9, 2009, Sicheron said defense counsel either came to his repair shop or called him and told him the judge in the case said not to touch the car. Sicheron was never given the court order directing that the defendant preserve the car, and he was never told to secure the car to prevent someone else from tampering with it. Sicheron never told defense counsel that he bought the car for James, and he never told James that defense counsel told him the car was not to be touched. Sicheron noticed the car was missing from his repair shop on December 14, 2009, and the first person he called was the defendant's father. The defendant's father notified defense counsel about his contact with Sicheron, and on December 14 defense counsel called Sicheron and told him to report

13

to police that the car was stolen and was the subject of an open court investigation. The same day, Sicheron reported to police that he was the owner of the car and that the car was stolen and under investigation. Sicheron testified at the hearing that James was the owner of the car, but he did not mention James to police when he reported the car was stolen. James testified that, on December 6, 2009, he took the car from the unsecured location where it was sitting next to Sicheron's repair shop, removed the engine from the car and loaded it on his truck, and that, on December 7, he took the remaining body of the car to a recycle business where it was crushed. About a week later, James brought the engine back to Sicheron's repair shop. Sicheron knew that James had removed the engine from the car, and knew that the throttle and cruise control cable assembly was still on the engine and available for inspection. Sicheron did not mention to defense counsel that the engine, with the critical parts, was still available. Rather, he installed the engine in James's car, and, while doing so, removed the throttle and cruise control cable assembly from the engine and discarded those parts, which were lost and are no longer available for inspection by the state. Sicheron's explanation for discarding the critical engine parts was that he did not know anyone wanted to see the engine, and that, "after the car got crushed and everything, I thought that was it." Other evidence showed that, when the state initially

14

had possession of the car to investigate the November 2007 accident, there was no indication or claim during the state's investigation that mechanical malfunction caused or contributed to the accident, and the state released the car to the owner without conducting any inspection of the car's throttle and cruise control cable assembly.

After the evidentiary hearing, the trial court granted the state's motion to exclude the proffered evidence by concluding: (1) that actions by defense counsel and others, taken on defendant's behalf, showed the defendant's bad faith failure to comply with the court's September 9, 2009 order that the car be preserved for inspection by the state; and (2) that the state was prejudiced. As set forth in the above procedural history and evidentiary hearing, we find facts, and reasonable inferences from the facts, sufficient to support the trial court's conclusions with respect to bad faith and prejudice, as follows:

After the defendant's experts inspected the car in support of the mechanical malfunction claim, defense witnesses (the defendant's father and Sicheron) took actions calculated to prevent the car from being available for inspection by the state. In March 2009, the defendant's father (who owned the car at the time) and Sicheron (a mechanic who had worked with the defendant) inspected the throttle and cruise

15

control assembly on the car, and collaborated with a defense investigator to help establish the defendant's mechanical malfunction claim. Both the defendant's father and Sicheron were listed as potential witnesses for the defense. In June 2009, the defendant's father sold the car to Sicheron for $300.00, a fraction of the car's fair market value, and Sicheron remained in weekly contact with the father hoping to profit from a business relationship. After the car was sold, the defendant's father retained possession of the car while the defense was developing its mechanical malfunction claim. But in July or August 2009, Sicheron took possession of the car from the defendant's father and moved the car from a secure storage facility to a location with no security outside Sicheron's repair shop. Sicheron left the car outside the shop with the understanding that the car belonged to a customer, James, who gave Sicheron $500.00 to buy the car for the engine.

While the car was being kept by Sicheron at this unprotected location, actions taken by the defendant's defense counsel contributed to the eventual destruction of the critical engine parts and violation of the court's order that the defendant preserve the car for the state's inspection. The defendant (acting through defense counsel) delayed providing court-ordered discovery to the state about the mechanical malfunction claim. When the defendant eventually revealed the malfunction claim,

16

and the court ordered the defendant to preserve the car for inspection by the state, defense counsel misinformed the court that the car was owned by the defendant's father and was being preserved for the purpose of inspection. Defense counsel also failed to comply with the court's discovery order to provide the state, no later than July 31, 2009, with the opinions of defendant's experts who had already inspected the car. When defense counsel finally provided the state with general (but insufficient) summaries of expert opinions revealing the malfunction claim, the state requested time to locate an expert and an opportunity to have its expert inspect the car to respond to the claim. But at the September 4, 2009 hearing, defense counsel denied knowing where the car was located. After the court directed defense counsel to find the car, counsel spoke by phone with the defendant's father, then informed the court at the same hearing that the car was owned by the defendant's father and was located in Oxford. Nevertheless, defense counsel argued that the state should be denied any opportunity to inspect the car. The court rejected that argument and immediately ordered pursuant to OCGA § 17-16-4 (b) (1) that the defendant preserve the car for the state to inspect, and asked if the defendant had any objection to the order. Defense counsel said there was no objection to the preservation order and assured the court that the car "has been saved for this reason." Accordingly, defense counsel not only

17

acquiesced in the court's order that the defendant preserve the car for inspection, counsel induced the order by assuring the court that the defendant's father owned the car and that the car was being preserved for the purpose of inspection. These assurances were not true. According to defense counsel, a few days later on September 9, he learned in a conversation with the defendant's father that the father had sold the car to Sicheron. Defense counsel traveled that day to Oxford, saw the car sitting outside Sicheron's repair shop, and spoke to Sicheron about the car. Sicheron said defense counsel told him that the judge in the case said not to touch the car, but that he was never given the court order directing preservation of the car, nor was he told to keep the car in a secure location to preserve it for inspection. At that point, defense counsel knew: (a) that he had misinformed the court that the defendant's father owned car; (b) that the car was no longer being preserved for inspection in the manner he had assured the court; and (c) that this information was critical to the court's order that the defendant preserve the car for inspection. To correct these misrepresentations, defense counsel waited until September 28 when he unobtrusively inserted (near the end of an unrelated motion) statements that he had learned the car was in a "storage facility" in Oxford; that the owner of the facility was the new owner of the car; and that he told the new owner the car cannot be altered pursuant to the

18

court's order. (Of course counsel knew the unnamed new owner was Sicheron, and that the car was certainly not in a storage facility.) In any event, placing this information (or burying it) in the body of an unrelated motion was not a good faith effort to correct the false information defense counsel previously gave the court. At the next status conference on October 9, 2009, defense counsel had an opportunity to tell the court about the true status of the car, but counsel made no mention of the change in ownership or location of the car, but simply told the court that the car was available for inspection pursuant to the court order. The record of the subsequent January 2010 hearing (after the car and critical engine parts were destroyed or lost) shows that the trial court still remained under the false impression that the car was owned by the defendant's father. Even assuming defense counsel was unaware at the September 4 hearing that the defendant's father no longer owned the car and that the car was sitting outside Sicheron's repair shop in Oxford, counsel admittedly discovered these facts on September 9 and failed to take reasonable steps to inform the court. This was evidence that defense counsel's deliberate action (or inaction) was designed to keep the court unaware of the true facts regarding the ownership and location of the car, ensure that the court had no opportunity to take additional steps

19

to preserve the car for inspection by the state, and obtain a tactical advantage for the defendant.

As a result of defense counsel's action, along with actions taken by the defendant's father and Sicheron, the car remained outside Sicheron's shop with no security until December 6, 2009. On that date, James, who was never told by Sicheron that a judge said the car was not to be touched, took the car, removed the engine, and had the remaining car body crushed. This occurred shortly before the state's scheduled inspection, and Sicheron's first call about the missing car was to the defendant's father. When James brought the car's engine back to Sicheron's shop, Sicheron knew the engine still had the critical parts attached (the throttle and cruise control cable assembly) that he had previously inspected with the defendant's father to support the malfunction claim, but Sicheron did nothing to call attention to the fact that these parts were still available. Instead, Sicheron removed and discarded those parts when he installed the engine in James's vehicle. As a result, the critical engine parts, which had been inspected by the defendant's experts to support the malfunction claim, were deliberately thrown away and are no longer available for inspection by the state. The trial court found that Sicheron's explanation for discarding the critical parts – that he did not know anyone wanted to see the engine – was not credible. But

the court found that other facts – Sicheron's acquisition of the car from the defendant's father for below market value, his frequent contact with the father, and his hope to profit from doing business with the father – showed that Sicheron had a financial motivation to cooperate with the defendant's father to dispose of the critical engine parts.

Although there was evidence to support the trial court's conclusion that the actions by the defendant's father and Sicheron were taken in bad faith, we find no evidence sufficient to support the court's conclusion that these two witnesses acted as the defendant's agents. But even if the defendant's father and Sicheron acted without the defendant's knowledge, there was evidence to support the trial court's conclusion that defense counsel took actions in bad faith calculated to conceal or enable the actions taken in bad faith by the defendant's father and Sicheron, therefore counsel's bad faith contributed to the destruction of the critical engine parts in violation of the court's order. The defendant was responsible for actions taken in bad faith by his defense counsel. *Taylor v. Illinois*, 484 U. S. 400, 416-418 (108 SCt 646, 98 LE2d 798) (1988). Accordingly, we find no clear error in the trial court's determination that the evidence was sufficient to show the defendant acted in bad faith in violation of the court's order, and that the destruction of the evidence was not

simply the result of mistake. *Theophile v. State*, 295 Ga. App. 517, 520 (672 SE2d 479) (2009) (determination that evidence showed bad faith and prejudice accepted unless clearly erroneous). We also find no clear error in the trial court's finding that the evidence was sufficient to show the state was prejudiced because, in the absence of the lost engine parts (already inspected by the defendant's experts), the state lost all opportunity to inspect those parts to refute the defendant's mechanical malfunction defense arising from expert witnesses, fact witnesses, or evidence of the recall. Id. Under these circumstances, we find the trial court did not abuse its discretion by excluding evidence and testimony about the possible mechanical malfunction, including evidence of the BMW recall 97V131. OCGA § 17-16-6; *Jones*, 290 Ga. at 578.

Contrary to the defendant's contentions, his constitutional right to present a defense (grounded in the Sixth Amendment's Compulsory Process Clause and the Fifth Amendment's due process clause) was not violated by the trial court's exclusion of evidence pursuant to OCGA § 17-16-6 of the Discovery Act. The reciprocal discovery provisions in the Act further legitimate state interests by establishing

> a closely symmetrical scheme of discovery in criminal cases that maximizes the presentation of reliable evidence, minimizes the risk that

a judgment will be predicated on incomplete or misleading evidence, and fosters fairness and efficiency in criminal proceedings.

*State v. Lucious*, 271 Ga. 361, 363 (518 SE2d 677) (1999). Exclusion of evidence under OCGA § 17-16-6 for failure to comply with the Act's discovery requirements applies only on a showing of bad faith and prejudice, and is imposed mutually on the state and the defendant to ensure compliance with the Act. A defendant has no unqualified constitutional right to present evidence that violates a state's rules of evidence and procedure, and "probative evidence may, in certain circumstances, be precluded when a criminal defendant fails to comply with a valid discovery rule." *Michigan v. Lucas*, 500 U. S. 145, 151 (111 SCt 1743, 114 LE2d 205) (1991); *Taylor*, 484 U. S. at 410-416; *United States v. Scheffer*, 523 U. S. 303, 308 (118 SCt 1261, 140 LE2d 413) (1998) (a defendant's right to present a defense "is subject to reasonable restrictions . . . and state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials . . . so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." (punctuation and citation omitted)). Where the defendant (through actions of the defendant's attorney) violates discovery provisions by wilful misconduct designed to obtain a tactical advantage, there is no constitutional bar to exclusion of the

23

evidence. *Taylor*, 484 U. S. at 413-418; *United States v. Nobles*, 422 U. S. 225, 241 (95 SCt 2160, 45 LE2d 141) (1975) (no constitutional right to present testimony free from the legitimate demands of the adversarial system). As set forth above, the trial court's finding that the defendant's attorney took actions in bad faith was based on evidence that the attorney engaged in wilful misconduct designed to obtain a tactical advantage for the defense by enabling destruction of evidence, in violation of the Discovery Act, to prevent the state from inspecting the evidence to rebut the mechanical malfunction defense. In those circumstances, the Supreme Court has made clear that "regardless of whether prejudice to the prosecution could have been avoided by a lesser penalty, the severest sanction was appropriate." *Michigan*, 500 U. S. at 152 (punctuation and citation omitted); *Taylor*, 484 U. S. at 417. Accordingly, there was no constitutional bar to the trial court's order entered under OCGA § 17-16-6 excluding the defense evidence.

3. Moceri claims the trial court erred by excluding testimony from an expert witness offered during the trial to explain evidence presented by the state showing the car's tire marks at the scene of the crash. Defense counsel argued that, by presenting evidence of tire marks made by the car to explain how the crash occurred, the state opened the door to evidence of a possible mechanical malfunction of the car as the

24

cause of the crash. Defense counsel proffered testimony from an expert mechanical engineer that the only logical explanation for the length of the car's tire marks was that, even though the car was braking, "some additional force prevented the car from stopping." According to the proffer, the expert would have testified that the "additional force can be generated by a car still pulling forward . . . caused by a throttle still open, working against the braking force." We find no error in the trial court's exclusion of this expert testimony on the basis that it was an attempt to introduce evidence of mechanical malfunction previously excluded by the court. See division 2, supra.

*Judgment affirmed. Doyle, C. J., and Ray, J., concur.*