**FIFTH DIVISION**
**DILLARD, P. J.,**
**PETERSON and REESE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**December 20, 2016**

# In the Court of Appeals of Georgia

A16A1583. ADAMS v. THE STATE.

PETERSON, Judge.

Dana Marie Adams bought marijuana for a 13-year-old boy before having sex with him several times. For these acts, she was convicted of aggravated child molestation, child molestation, and two counts of contributing to the delinquency of a minor. We affirm those convictions because the boy's testimony was sufficient evidence to support the jury's verdict, and because the trial court did not commit reversible error in admitting a 911 tape for purposes of impeachment.

But these were not Adams's only convictions. When Adams left her house to purchase marijuana, she left her two young children asleep at home alone for less than an hour. For the act of leaving her children alone for less than an hour, she was also convicted of two counts of contributing to the deprivation of a minor. But construing

the relevant criminal statute strictly against the State requires us to conclude that merely leaving a child alone for less than an hour — without more — does not violate that statute. We reverse Adams's convictions for contributing to the deprivation of a minor.

1. On appeal from a criminal conviction, we view the evidence in the light most favorable to the jury's verdict. *See Watkins v. State*, 336 Ga. App. 145, 146 (1) (784 SE2d 11) (2016). We neither weigh the evidence nor determine witness credibility, but only determine whether the evidence was sufficient to allow a jury to find guilt beyond a reasonable doubt. *See id.*

So viewed, the evidence shows that Adams has three children, K. R. and two children both with the initials R. A. and R. A.[1] At the time in question, K. R. was 12 years old and R. A. and R. A. were both under the age of five. Adams also spent a fair bit of time with her nephews, including T. B. In October 2011, T. B. and his cousin C. C. — both 13 years old — were spending the night at Adams's house.[2] Also present were Adams's three children and K. R.'s friend, J. M. At some point, C. C.

---

[1] Adams is not the biological mother of K. R., who is actually Adams's cousin. Adams and her husband gained custody of K. R., who had been abused by her biological parents. Both Adams and K. R. referred to Adams as K. R.'s mother.

[2] C. C. is T. B.'s cousin, but he is not related to Adams.

2

asked Adams if she would give him $20 for washing her camper so that he would have money to buy some marijuana. Adams not only agreed to give C. C. the money, she said she would drive him to get the marijuana after she put her youngest two children to bed.

After putting those children to bed,[3] Adams drove C. C., T. B., K. R., and J. M. to a location 10-15 minutes away where they waited another 15-20 minutes for the marijuana dealer to arrive. Adams, who had been drinking, backed into a fence and swerved all over the road during the drive. After they returned to Adams's house, Adams and the two boys went into the camper where they were joined by Adams's friend, Karen Morris. The four smoked marijuana, and Adams drank alcohol, which she shared with C. C. Both C. C. and Morris described Adams as drunk.

Morris left around midnight and took J. M. and K. R. back to her house to sleep. J. M. wanted to leave because Adams was drunk, and she was not sure what would happen. T. B. also left the camper and returned to the house. When Adams and C. C. were alone in the camper, Adams performed oral sex on C. C. and the two had intercourse. They returned to the house, where C. C. told T. B. what he had been

---

[3] C. C. testified that the children were put to bed "in their bedroom"; Adams testified that the youngest child slept in her crib in the children's shared room that night, while the other young child slept in Adams's bed per their usual routine.

3

doing. T. B. fell asleep in the computer room, and C. C. joined Adams in K. R.'s bed, where the two again had intercourse. K. R. returned home the next morning to get some clothes. When she found the front door locked, she went to her bedroom window and saw two people in her bed. Later that morning, C. C. and Adams went into Adams's bedroom where they again engaged in intercourse.

Adams drove C. C. home, and C. C.'s mother and her boyfriend both noticed a hickey on C. C.'s neck. C. C. initially did not tell any adult about the night's events because he did not want Adams to get in trouble. But the mother's boyfriend was suspicious and kept asking questions until C. C. finally told him what had happened. C. C.'s parents were then told, and his father contacted law enforcement.

Adams was indicted for aggravated child molestation for performing oral sex on C. C., child molestation for engaging in intercourse with C. C., contributing to the delinquency of a minor for encouraging and aiding C. C. in committing the delinquent act of possessing marijuana and alcohol, contributing to the delinquency of a minor for encouraging T. B. to commit the delinquent act of possessing marijuana and alcohol, and two counts of contributing to the deprivation of a minor for leaving her two youngest children unattended at home while she drove C. C. to purchase

4

marijuana. At trial, Adams testified in her own defense and claimed that the allegations against her were untrue. The jury found Adams guilty of all charges.

(a) Adams argues that the evidence was insufficient to sustain her convictions for aggravated child molestation and child molestation. We disagree.

> A person commits the offense of child molestation when . . . she does any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person. A person commits the offense of aggravated child molestation when [she] commits an offense of child molestation which involves an act of sodomy.

*Frankmann v. State*, 281 Ga. App. 1, 2 (635 SE2d 272) (2006) (footnotes and punctuation omitted). Here, C. C. testified that Adams performed oral sodomy on him and engaged him in sexual intercourse. This testimony was sufficient to establish the offenses of child molestation and aggravated child molestation. *See id.* (the testimony of the victim alone was sufficient to establish the offenses of child molestation and aggravated child molestation).

According to Adams, C. C.'s testimony should be disregarded because he had a motive to lie.[4] It is, however, "the function of the jury to determine the credibility of the witnesses. The jurors must weigh and resolve any conflicts presented by the evidence. The appellate court must view the evidence in the light most favorable to the jury's verdict." *Scott v. State*, 207 Ga. App. 334, 334 (427 SE2d 832) (1993) (punctuation omitted). Given C. C.'s testimony, the jury was authorized to find Adams guilty of molestation and aggravated molestation. *See id.*

(b) Adams argues that the evidence was insufficient to sustain her convictions for contributing to the deprivation of a minor. We agree.

The evidence indicates that the two youngest children were left alone for less than an hour. Adams argues that such an isolated act does not constitute deprivation unless it results in emotional or physical harm to the child. The State responds that it need not prove that the children suffered "actual harm" as a result of Adams's actions, suggesting that leaving the children alone for any length of time violates the law. As explained below, this case presents the question of whether leaving sleeping young children home alone during the night for less than an hour — without more,

---

[4] Adams testified at trial that C. C.'s mother and her boyfriend had stolen Adams' debit card. She claims that C. C. fabricated the molestation accusations to discredit her after she pressed charges against the mother's boyfriend.

6

and without any harm occurring to them — deprives a child of the physical, mental, emotional or moral needs essential to the child's well-being. And here we must resolve that question in the criminal law context, which requires us to construe the relevant statute strictly against the State. That requirement ultimately leads us to conclude that Adams's actions did not violate the statute so construed.

Under the version of OCGA § 16-12-1(b)(3) in effect at the time of the actions giving rise to this prosecution,[5] a person committed the offense of contributing to the deprivation of a minor when he or she "willfully commits an act or acts or willfully fails to act when such act or omission would cause a minor to be found to be a deprived child as such is defined in Code Section 15-11-2[.]" The version of OCGA § 15-11-2 then in effect provided that a child may be "deprived" in several ways; the State relies on the provision that defined as deprived a child who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or

_____

[5] OCGA § 16-12-1 has since been amended consistent with the new Juvenile Code. The current version now provides that "[a] person commits the offense of contributing to the . . . dependency of a minor . . . when such person [w]illfully commits an act or acts or willfully fails to act when such act or omission would cause a minor to be adjudicated to be a dependent child as such term is defined in Code Section 15-11-2." OCGA § 16-12-1(b)(3).

control necessary for the child's physical, mental, or emotional health or morals[.]" OCGA § 15-11-2(8)(A) (2012).

"Proper parental care or control" is not a term defined in the statute. And at first blush, it might seem as though the General Assembly simply enacted a statute making it a crime to act willfully in a manner that fails to provide "proper care" for a child and left it up to the courts to determine what care is proper and what is not. But our Supreme Court has already resolved a vagueness challenge to this very statute, and has done so by narrowing the statute's scope. *See Bagby v. State*, 274 Ga. 222 (552 SE2d 807) (2001).

To survive a vagueness challenge, it is necessary only that a "challenged statute convey sufficiently definite warning as to the proscribed conduct when measured by common understanding[.]" *Id*. at 223 (1). The Court observed that, like all criminal statutes, the statute must be strictly construed against the State. *Id*. at 224 (1). And the Court concluded that doing so rendered OCGA § 16-12-1(b)(3) sufficiently definite: construing it against the State, and "[m]easured by common understanding, the statute prohibits a person from wilfully committing an act or omission that deprives a child of the physical, mental, emotional or moral needs essential to the child's well-being." *Id*. The Court concluded that this prohibition had been violated when the evidence

8

showed that a mother left her child alone with the mother's boyfriend, who had repeatedly committed violent acts against the child during the preceding months and promised to do so again, and then failed timely to ensure medical attention upon returning and seeing the child with a head injury. Of course, any person of ordinary understanding would agree that willfully failing to protect one's child from someone who has expressed an intent to harm them is sufficient evidence that the defendant has deprived their "child of the physical . . . needs essential to the child's well-being."

But that conclusion, viewed in the context of the appalling facts of that case, shows that this case is quite different. It is far from obvious that all persons of ordinary understanding would agree that leaving young children home alone asleep for less than an hour — without any unusual risk factors present, and without the children experiencing any harm — similarly deprives those children of needs essential to their well-being.[6]

_____

[6] Because the Supreme Court has construed the statute in this fashion, we lack the authority separately to consider what different meaning the statute's language might have. But in any event, we note that the statute's key terms were undefined, and what definitional help we can find from other statutes *in pari materia* is largely circular. *See* OCGA § 15-11-2(8)(A) (2012) (defining "deprived child" in pertinent part as one without "proper parental care or control," but not defining "proper parental care or control"); *compare also* OCGA § 15-11-94(b)(4)(B) (2012) (in termination context, court "shall consider" in "determining whether the child is without proper parental care and control" six factors, most relevantly including

9

Our own limited case law applying this statute, like *Bagby*, has also involved considerable harm to children. In *Ellis v. State*, 283 Ga. App. 808 (642 SE2d 869) (2007), one of the very few cases in which we considered a sufficiency of the evidence challenge to a conviction under OCGA § 16-12-1(b)(3), the defendant left two children, ages one and two, home alone on a very cold morning for what he claimed was only a few minutes while he purportedly assisted a neighbor. *Id.* at 809-10 (1). Citing evidence that one child left the house long enough to develop hypothermia, and both children were emotionally upset, we rejected the defendant's argument that the incident was merely a "close call" that did not rise to the level of criminal conduct. *Id.* at 810 (1). Although our opinion in that case supports the notion that leaving children at home alone for some period of time, under some circumstances, can support a conviction under OCGA § 16-12-1(b)(3), it also rested heavily on the evidence of harm to the children. *Id.* (rejecting defendant's argument that his conduct was not criminal and affirming conviction "in light of the evidence showing" the emotional and physical impact of the defendant's conduct on the

"[p]hysical, mental, or emotional neglect of the child," but not defining "neglect") *with* Webster's New World Dictionary 951 (2d College ed. 1980) (defining "neglect" in part as "to fail to care for or attend to sufficiently or properly").

10

children). *See also Hoang v. State*, 250 Ga. App. 403, 408-09 (2) (551 SE2d 813) (2001) (infant died after defendant babysitter failed to seek medical care).

The State's position would mean that the prior version of OCGA § 16-12-1(b)(3) required all parents everywhere to surveil their children at all times; the State argues in its brief, "[a]s the recent event at the Cincinnati Zoo involving a three-year-old boy and a 450-pound silverback gorilla illustrates, failing to supervise a child for even a moment can lead to catastrophe." But merely to repeat this suggestion is to refute it; indeed, under this interpretation, parental sleep may well be a crime. Surely leaving one's sleeping child alone in the house for a brief moment while walking to the end of the driveway to collect the mail was not a crime under this statute. Likewise, it surely was a crime under this provision to leave toddlers home alone for a week to go on a cruise.

Neither the statutory text nor the case law allow us to say with precision where the statutory line lies between these two examples. What we can say with sufficient certainty is that, considering all of the various statutory provisions discussed above and the relevant case law, we cannot conclude with confidence that Adams's act of leaving her sleeping children for less than an hour was an act that persons of ordinary understanding would conclude deprived those children of needs essential to their

11

well-being. Construing the criminal law strictly against the State, we must reverse Adams's misdemeanor convictions for the offense of contributing to the deprivation of a minor. Certainly Adams's reason for leaving the children home alone was far from compelling; indeed, it was criminal (but a different crime, the conviction for which we are affirming). But regardless of the reason, we cannot say that evidence of leaving young children home alone asleep in bed for a few minutes — without more — is sufficient to prove beyond a reasonable doubt a crime under the applicable version of OCGA § 16-12-1(b)(3). Accordingly, we reverse Adams's two convictions for contributing to the deprivation of a minor.

2. Given that those are the only two convictions we reverse on the basis of insufficient evidence, we also consider Adams's argument that her convictions should be reversed because the trial court erred in allowing the State to introduce the recording of a 911 call. We disagree with Adams's argument on that point.

At trial, Adams testified in her own defense and portrayed herself as a dutiful, loving mother. During the trial, the lead investigator learned about allegations that Adams had struck K. R. The investigator thus looked to see if any 911 calls had been made, and he discovered a 911 recording from Adams's husband in which he complained that Adams had slapped K. R. The State sought to impeach Adams's

12

testimony by playing the 911 call for the jury. Adams objected to the introduction of the evidence because she had not been given a copy of the recording before trial. The trial court overruled the objection, and the recording was admitted into evidence. Adams appeals that ruling.

The record shows that Adams elected to proceed under the reciprocal discovery provisions of OCGA § 17-16-1 et seq. by serving written notice on the State, as required by OCGA § 17-16-2 (a). Accordingly, the State was required "no later than ten days prior to trial" to disclose to Adams any recording it intended to use as evidence in the case in chief or as rebuttal evidence. *See* OCGA § 17-16-4 (a) (3) (A). The State's failure to comply with this statute permits a trial court, upon a showing of prejudice and bad faith, to exclude the evidence. *See* OCGA § 17-16-6. We review a trial court's ruling in this regard for abuse of discretion. *See Burton v. State*, 330 Ga. App. 503, 506 (767 SE2d 510) (2014). And we affirm the trial court's exercise of discretion here for two independent reasons.

First, even if the State was required to disclose the 911 tape prior to trial, the admission of the evidence does not constitute reversible error. OCGA § 17-16-6 provides the trial court broad authority to craft a remedy in the event of a discovery violation. The trial court may "permit the discovery or inspection, . . . grant a

13

continuance, or, upon a showing of prejudice and bad faith, prohibit the state from introducing the evidence not disclosed . . . or may enter such other order as it deems just under the circumstances." OCGA § 17-16-6. "Exclusion of evidence is a particularly harsh sanction and should be imposed only where there is a showing of prejudice to the defense and bad faith by the State." *Leger v. State*, 291 Ga. 584, 586 (2) (732 SE2d 53) (2012) (punctuation omitted). Here, Adams has not shown the State acted in bad faith. Rather, the record shows that neither the prosecutor nor the prosecutor's investigator knew about the existence of the 911 tape prior to the start of trial. Under these circumstances, it cannot be said that the State acted in bad faith in failing to provide the 911 recording prior to trial. *See Brown v. State*, 281 Ga. App. 557, 559 (636 SE2d 717) (2006); *Boykin*, 264 Ga. App. at 840 (3).

Second, Adams did not seek any remedy authorized by the statute except for the exclusion of the evidence. And a defendant's failure to request a continuance to cure the State's failure to produce discovery generally results in waiver of the issue on appeal. *See Spencer v. State*, 296 Ga. App. 828, 830 (1) (676 SE2d 274) (2009); *Thompson v. State*, 262 Ga. App. 17, 21 (4) (585 SE2d 125) (2003). Accordingly, Adams's failure to seek a continuance to cure any alleged failure of the State to comply with discovery precludes her from raising the issue on appeal. *See id*.

14

*Judgment affirmed in part and reversed in part. Dillard, P. J., and Reese, J., concur.*