**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**July 10, 2017**

# In the Court of Appeals of Georgia

A17A0820. THOMAS v. THE STATE.

BARNES, Presiding Judge.

Star Ashley Thomas appeals her convictions for trafficking in methamphetamine and three misdemeanor drug offenses. She argues that there was insufficient evidence to support her trafficking conviction, that the trial court erred by allowing a forensic chemist from the Georgia Bureau of Investigation ("GBI") to testify about drug identification tests performed by a different chemist, and that her trial counsel rendered ineffective assistance by failing to object to the introduction into evidence of both chemists' crime lab reports. We find no error and affirm.

Viewed in a light favorable to the jury's verdict,[1] the evidence shows that in January 2014, Thomas's brother overdosed on heroin at their mother's Douglasville home, where Thomas also lived. The first responder at the scene was a police corporal, who found the man's mother and two other women attempting to resuscitate

---

[1] See *Hubbard v. State*, 274 Ga. App. 639, 639 (618 SE2d 690) (2005).

him. Emergency medical services personnel arrived soon after and transported the man to a hospital, accompanied by the mother and one of the other women, a family friend who was visiting from out of town. The man later died.

The third woman who had been helping him stayed behind at the house, and the corporal interviewed her. The third woman told the corporal that she and the man had used heroin and marijuana earlier, and she gave the corporal a marijuana pipe and the wrapper in which the heroin had been packaged.

While the corporal was talking to the third woman, Thomas came upstairs from the basement and the corporal noticed her for the first time. The corporal followed Thomas back downstairs to a bedroom she identified as hers. After ascertaining her identity, he brought her upstairs for questioning. Suspecting there were more drugs in the house, the corporal asked Thomas for permission to search, but she said no. He told her to wait in the kitchen while the police applied for a search warrant. At that point, Thomas – whose demeanor had been calm – became "very concerned" and wanted to leave the house.

The detective assigned to the case obtained a warrant and, with the assistance of another officer, searched Thomas's bedroom. Before the search began, Thomas told the detective that he "might find a little marijuana, but that's all [she had]." On

top of the dresser, however, the police found a "white crystal-like substance" – which they suspected was methamphetamine – "sprinkled out" on a plate, along with a rolled up dollar bill.[2] Inside a drawer, the police found a plastic tub containing a large amount of a substance that field-tested positive for methamphetamine. The substance was later taken to the GBI crime lab and was determined to weigh 37.24 grams and to contain methamphetamine. Next to the tub was a bottle of "crystal flake," a substance commonly used to "cut" methamphetamine. Elsewhere in the room the police found a digital scale, a number of baggies, a glass methamphetamine pipe, two grinders used to pulverize marijuana, several marijuana cigarettes, and several pills of a prescription muscle relaxant, Tizanidine.

Thomas was arrested and charged with trafficking in methamphetamine and possession of marijuana, Tizanidine, and drug-related objects.[3] At trial, Thomas and her mother testified in Thomas's defense. Thomas conceded that the marijuana and marijuana-related materials found in her bedroom were hers. She maintained, however, that the tub of methamphetamine had been left behind by her former live-in

---

[2] The assisting officer testified that rolled-up bills are commonly used to snort methamphetamine.

[3] Thomas also was charged with possession of another prescription medication discovered in her room, but the jury found her not guilty of that offense.

boyfriend, who had told her it contained "some kind of carpet cleaner . . . used as a cut." Thomas stated that her ex-boyfriend also had left behind clothing in the dresser and closet, and her mother likewise testified that his clothing was present in the room.[4] According to Thomas's mother, the visiting family friend had been sleeping in Thomas's bedroom during the week before her son's overdose. Thomas insisted that the suspected methamphetamine found on top of her dresser belonged to the family friend. The detective who searched Thomas's room found no men's clothing there, and no sign that anyone except Thomas was living in the room.

A jury found Thomas guilty of the charges. She filed a motion for new trial, which the trial court denied, and this appeal followed.

1. Thomas argues that there was insufficient evidence to support her trafficking conviction because the State failed to show that she constructively possessed the methamphetamine found in her dresser.[5] She contends that her ex-boyfriend and the family friend staying in her bedroom had equal access to the methamphetamine and

---

[4] Thomas and her ex-boyfriend had been arrested on drug charges, including trafficking in methamphetamine, the previous year. The charges against Thomas were dropped, but her ex-boyfriend apparently was convicted and remained incarcerated at the time of Thomas's trial.

[5] The suspected methamphetamine found on top of the dresser was neither weighed nor tested and thus did not form the basis of the trafficking charge.

that the evidence of her possession of it "was based merely on spatial proximity." We conclude that whether Thomas constructively possessed the methamphetamine was a question for the jury.

A person who knowingly possesses 28 or more grams of methamphetamine commits the offense of trafficking in methamphetamine. OCGA § 16-13-31 (e); see also *Navarro v. State*, 293 Ga. App. 329, 330-331 (667 SE2d 125) (2008). "If the State presents evidence that a defendant owned or controlled premises where contraband was found, it gives rise to a rebuttable presumption that the defendant possessed the contraband." (Citation and punctuation omitted.) *Bailey v. State*, 294 Ga. App. 437, 439-440 (1) (669 SE2d 453) (2008); see also *Swan v. State*, 300 Ga. App. 667, 670 (2) (686 SE2d 310) (2009); *Castillo v. State*, 288 Ga. App. 828, 830 (655 SE2d 695) (2007). This presumption may be rebutted by evidence that someone other than the defendant had equal access to the specific place where the contraband was found, but whether the defendant presented sufficient evidence to establish equal access is a jury question. *Swanger v. State*, 251 Ga. App. 182, 185-186 (554 SE2d 207) (2001) ("[h]aving heard evidence in support of [defendant's] equal access theory, the jury was authorized to reject it").

Thomas presumptively possessed the methamphetamine at issue here because it was found in a dresser in her bedroom. See *Swan*, 300 Ga. App. at 670 (2); *Bailey*, 294 Ga. App. at 439-440 (1). Additionally, evidence of recent methamphetamine use was found in open view on top of the dresser, Thomas admitted that other drugs and drug paraphernalia found in the room were hers, and the police saw no indication that anyone else was living in the room. Although Thomas claimed that the methamphetamine in the dresser and the suspected methamphetamine on top of the dresser belonged to other people, the jury was not required to believe her testimony. See *Swan*, 300 Ga. App. at 670-671 ("[w]hether the evidence of equal access is sufficient to rebut any inference of possession arising from discovery of drugs in the defendant's bedroom is a question properly left to the jury" (citation and punctuation omitted)).

2. Thomas argues that the trial court erred by allowing a GBI forensic chemist to testify about drug identification tests performed by a different chemist who was not available at trial. We disagree.

During trial, the State announced that the chemist who had weighed and performed the drug analysis of the methamphetamine found in Thomas's dresser could not come to court due to her husband's medical emergency and her own serious

illness. Over Thomas's objection, the State presented the testimony of the woman's co-worker, another GBI chemist, who was tendered as an expert in forensic chemistry and drug identification testing. The second chemist stated that while he had neither performed the drug analysis himself nor witnessed the first chemist doing so, he had independently evaluated the data on which her results were based and reached his own conclusion:

> Essentially, in our software system, we have at the laboratory, where we keep all of our technical data and results, whatever, I basically looked at the data she had produced in our software system. I looked up, you know, everything she did . . . and all the data that she used to draw a conclusion on this case. And essentially, with my expertise, I looked at that data, came to the same conclusion she did, and I produced a report signifying that.

The second chemist also examined the instruments that the first chemist had used and found them to be in working order. He testified that the first chemist was a "very straight arrow" known for her diligence and that "[t]here was nothing in the data to suspect any kind of mishandling of the evidence or her way of testing it." He explained that if the first chemist had improperly performed the tests, "it would show in the data that she did something wrong or that the data she produced [wasn't] consistent." Ultimately, the second chemist agreed with the first chemist that the

7

substance in the tub was 37.24 grams of solid material containing methamphetamine. Thomas was able to cross-examine the second chemist, and the court instructed the jury to consider the fact that she was unable to cross-examine the first chemist when evaluating the credibility of the second chemist.

Thomas argues that the admission of the second chemist's testimony violated her right to confront the witnesses against her under the Confrontation Clause.[6] She cites *Bullcoming v. New Mexico*, 564 U. S. 647 (131 SCt 2705, 180 LE2d 610) (2011), in which the State of New Mexico introduced a forensic lab report certifying that a DUI defendant's blood-alcohol concentration was above the legal limit. The scientist who generated and signed the report had since been "placed on unpaid leave for an undisclosed reason," and the prosecution did not call him as a witness. Id. at 659 (II). Instead, the prosecution called a different scientist who "had neither observed nor reviewed [the original scientist's] analysis," nor reached an independent conclusion about it. Id. at 655 (I) (B). The United States Supreme Court ruled that the "surrogate testimony" of the second scientist was insufficient to satisfy the Confrontation Clause, particularly when the state had not asserted that the original

---

[6] See U. S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.").

8

scientist was unavailable, the defendant did not know why he had been placed on leave, and his presence at trial would have permitted the defendant to ask "questions designed to reveal whether incompetence, evasiveness, or dishonesty accounted for [the first scientist's] removal from his work station." Id. at 661 (II) (B).

Georgia courts "have consistently held that the Confrontation Clause does not require the analyst who actually completed the forensic testing used against a defendant to testify at trial." (Citation and punctuation omitted.) *Leger v. State*, 291 Ga. 584, 592 (5) (732 SE2d 53) (2012). In *Disharoon v. State*, 291 Ga. 45 (727 SE2d 465) (2012), the Georgia Supreme Court recognized *Bullcoming*'s condemnation of "surrogate testimony," but ruled that *Bullcoming* does not require the exclusion of a substitute witness who "is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." (Punctuation and citation omitted.) Id. at 48; see also *Leger*, 291 Ga. at 592 (5) (scientist who did not personally perform DNA tests, but supervised worker who did, interpreted worker's results, and wrote lab report could testify at trial); *Estrada v. State*, 319 Ga. App. 762, 765-766 (3) (738 SE2d 344) (2013) (analyst who performed lab testing was unavailable, but supervisor could testify because he had reviewed analyst's work to determine whether it had been performed correctly and whether he agreed with it).

9

In this case, there was evidence that the first chemist was known to be careful in her work, but was unavailable at trial due to circumstances unrelated to her job performance. The second chemist explained the procedures the first chemist had followed, inspected the testing instruments she had used, analyzed the data she had electronically stored, determined that the data appeared to be reliable, reached an independent conclusion concerning the nature of the tested substance, and generated his own report. Given the second chemist's "personal, albeit limited, connection to the scientific test at issue," *Disharoon*, 291 Ga. at 48, his testimony was not the sort of "surrogate testimony" forbidden by *Bullcoming*. Thomas's Confrontation Clause rights were not violated.[7]

3. Thomas argues that she received ineffective assistance of counsel because her trial lawyer failed to object, during the second chemist's testimony, to the admission into evidence of both his report and the report of the first chemist concerning the weight and nature of the substance found in her dresser drawer. Although counsel objected repeatedly to the testimony of the second chemist, he did

---

[7] Thomas also asserts that the second chemist's testimony was inadmissible hearsay. But the second chemist, who "made the determination that the substance was contraband based on [his] interpretation of the data[,] did testify at trial and was thus subject to cross-examination." *Carolina v. State*, 302 Ga. App. 40, 42 (690 SE2d 435) (2010). Therefore, there was no hearsay problem. See id.

10

not specifically challenge the admissibility of the lab reports. We, however, find no ineffective assistance.

The second chemist's lab report was admissible because the person who generated the report – the second chemist – testified at trial and was available for cross-examination. See *Wise v. State*, 300 Ga. 593, 598 (4) (797 SE2d 447) (2017); compare *Melendez-Diaz v. Massachusetts*, 557 U. S. 305 (129 SCt 2527, 174 LE2d 314) (2009) (crime lab reports are testimonial and therefore inadmissible unless the analysts themselves testify at trial). Any objection to the admission of the report would have been meritless, and the failure to make a meritless objection is not ineffective assistance of counsel. See *Tran v. State*, 340 Ga. App. 546, 554 (2) (c) (798 SE2d 71) (2017).

Assuming without deciding that the first chemist's lab report was not admissible, counsel's failure to object to its admission did not prejudice Thomas. As noted in Division 2, the second chemist properly testified about the first chemist's testing and conclusions, and the second chemist's independent report – which reached the same conclusions as the first chemist's report – was properly admitted into evidence. Because the first chemist's report was merely cumulative of other, admissible evidence, Thomas cannot establish the prejudice necessary for an

11

ineffective assistance claim. See *Wilson v. State*, 297 Ga. 86, 88 (2) (772 SE2d 689) (2015) ("The failure of trial counsel to object to such cumulative evidence does not support a claim for ineffective assistance of counsel.")

*Judgment affirmed. McMillian and Mercier, J.J., concur.*