**FIRST DIVISION**
**BARNES, P. J.,**
**MERCIER and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**August 6, 2019**

# In the Court of Appeals of Georgia

A19A1499. SANCHIOUS v. THE STATE.

BROWN, Judge.

A jury found Christopher Sanchious guilty of three counts of aggravated child molestation, two counts of child molestation, and one count each of aggravated sodomy and sexual battery involving his girlfriend's twelve-year-old daughter.[1] Sanchious appeals his convictions and the denial of his amended motion for new trial, challenging the trial court's admission of scientific reports and testimony regarding the analysis of one of those reports, and trial counsel's effectiveness. We affirm for the reasons set forth below.

---

[1] The jury acquitted Sanchious of other charges of rape, statutory rape, aggravated sodomy, aggravated child molestation, and tampering with evidence. The trial court merged two of the aggravated child molestation counts into the aggravated sodomy count, one child molestation count into the aggravated child molestation count, and the sexual battery count into the remaining child molestation count.

"Following a criminal conviction, the defendant is no longer presumed innocent, and we view the evidence in the light most favorable to sustain the verdict." (Citation omitted.) *Robinson v. State*, 342 Ga. App. 624, 625 (805 SE2d 103) (2017). So viewed, the evidence showed that Sanchious lived with the victim, the victim's mother, and the victim's brother and sister. On October 14, 2014, the victim was asleep in a bedroom of her home on top of a red comforter, when Sanchious came in, pulled down the victim's "night pants," and "put his penis in [her] butt." She felt something "going in and out of her butthole" and said her pants smelled like "sour milk" when Sanchious was done. The victim went to the bathroom afterward and noticed that her pants were wet and that "the wet look[ed] [w]hite." The victim was afraid to tell her mother in person, so she wrote a note and left it on the ironing board telling her mother that she "can't take it anymore" and that Sanchious "need[s] to leave" because "he is put[t]ing his hand[s] on [her] the wrong way . . . [and she] think[s] that is called rape." At the end of the note, the victim wrote "help me" because she was scared it might happen again. The mother did not see the note until later that evening when the victim handed it to her. The mother confronted Sanchious and he denied touching the victim. The mother took the victim to the hospital and then to police. The mother reported to police that Sanchious "anal[ly] penetrat[ed]"

2

the victim, after which the victim underwent a forensic medical exam. In addition to anal penetration, the victim testified at trial that in the summer of that same year, Sanchious licked her vagina. During the forensic medical exam, the victim reported the anal penetration and also advised medical personnel that Sanchious placed his penis in her vagina and her mouth, and put his finger in her vagina. During the forensic interview, the victim reported all of the above and also stated that Sanchious put his finger down her pants and touched her vagina outside of her underwear. She also reported that in September of the same year, he put his penis in her vagina.

The victim's younger sister testified at trial that sometime in October 2014, the victim told her that Sanchious was doing "stuff to [the victim] while she was asleep" on the floor of the sister's room. The sister stated that the victim was sleeping on top of a purple cover and under a red cover that had been given to the sister by her godmother. The sister never saw anything because she was asleep and told the victim to tell their mother immediately and "she will handle it."

The medical exam of the victim conducted in the early morning hours of October 16, 2014, along with the administration of a sexual assault kit, revealed a "healed tear" to her hymen, swelling in her vagina, and a recent abrasion, or bruising on the cervix, all consistent with "insertion of a penis." The exam also revealed a

3

recent injury to the victim's anus, one tear at the top and another toward the bottom, consistent with insertion of a penis. The nurse who conducted the exam testified that the victim had what appeared to be seminal fluid in her anus. The nurse handed over to police both the sexual assault kit and the victim's panties.

Sometime after 1:00 a.m. on October 16, 2014, and following the medical exam, officers accompanied the victim and her mother back to their home where they discovered Sanchious asleep in the mother's bed. Officers recovered two comforters from the victim's sister's room, one red and one purple, as well as the victim's night pants, which were warm from having just been "run through" the dryer because Sanchious had been doing laundry. Police collected a saliva sample from Sanchious, and sent the following items to the GBI for testing: the purple comforter; cuttings from the red comforter; the victim's panties; and the sexual assault kit.

A GBI serologist testified that the victim's panties tested positive for seminal fluid, and that a cutting from the red comforter tested positive for sperm and seminal fluid. Both items were sent for DNA testing. The serologist testified that it was unlikely for fluid to be detected on something that had been washed.

A GBI forensic biologist testified at trial about the DNA testing performed on the victim's sexual assault kit, her panties, and the cuttings from the red comforter.

She explained that as part of her duties at the GBI, she conducts DNA testing, but also performs peer reviews of DNA typing analysis reports, meaning that she "examine[s] all the notes and results in the report of an analyst, and [that she has] to come to the same conclusions." The purpose of peer review is "[t]o ensure that the analyst has followed policies and procedures, and that the results are correct and reliable" with the peer reviewer "actually evaluat[ing] the [analyst's] conclusion, or the steps taken to reach that conclusion." The forensic biologist testified that she personally tested the sexual assault kit in this case, but that another analyst tested the panties and red comforter subject to her peer review. The sexual assault kit tested negative for the presence of male DNA, while the comforter contained the DNA profiles of the victim and Sanchious. The panties also tested positive for the presence of DNA, and contained the DNA profiles of three individuals, including the victim, Sanchious, and an unknown person. One fraction of the DNA extracted from the panties came from sperm cells and a second came from non-sperm cells. The DNA of the unknown person and the victim were both located in the non-sperm cells, while Sanchious' DNA was found in the "sperm fraction." The forensic biologist testified that "[t]he frequency, or the statistic, of the DNA markers shared between . . . Sanchious and the DNA obtained . . . from the panties and the cutting recovered from

5

the comforter is approximately one in one hundred quadrillion in the African American population, and one in five hundred quadrillion in the Caucasian population." The forensic biologist concluded with "reasonable scientific certainty" that the DNA obtained from the panties and the comforter matched Sanchious or his identical twin, and testified that the analyst's "testing was done and followed according to policy and procedure." The trial court allowed the State to admit into evidence the forensic biologist's DNA report on the sexual assault kit (State's Exhibit 22), as well as the analyst's DNA report on the panties and the comforter (State's Exhibit 24). On cross-examination, the forensic biologist confirmed that she reviews the possibility of secondary transfer. Defense counsel also questioned the forensic biologist about the notes and data compiled by the analyst during her testing, and submitted those materials into evidence.

Sanchious testified at trial, denying that he ever touched the victim inappropriately. Sanchious could not explain why his semen was on the victim's panties, and claimed that the red comforter on which his semen was found was the comforter under which he and the victim's mother slept and had sex. The victim's mother testified that the red comforter was never on her bed or in her bedroom, and that she never had sex on or under the red comforter; it was in the victim's sister's

6

room and was a gift from a friend. On cross-examination, the mother clarified that her children would sometimes bring the red comforter into her room, place it on her bed, lay on the comforter, and then take it out of the room, but the children never left the blanket in her room permanently.

1. In two related enumerations, Sanchious contends that the trial court erred by allowing the forensic biologist to testify about the DNA testing performed by the analyst who was not available at trial, and in admitting the DNA report prepared by the unavailable analyst. During trial, Sanchious objected to both on grounds of hearsay; he alleges the same on appeal. "We . . . review the trial court's ruling on the admissibility of this evidence for abuse of discretion." *Carter v. State*, 302 Ga. 200, 202 (2) (805 SE2d 839) (2017).

(a) *Testimony*. In *Bullcoming v. New Mexico*, 564 U. S. 647 (131 SCt 2705, 180 LE2d 610) (2011), the United States Supreme Court addressed whether the prosecution may introduce into evidence a forensic laboratory report via the "surrogate testimony" of an analyst who did not sign the certification or personally conduct or observe the performance of the test reported in the certified lab report prepared by another analyst, and ruled that "it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the

7

accused has had a prior opportunity to confront that witness." Id. at 657 (I) (C). See also *Melendez-Diaz v. Massachusetts*, 557 U. S. 305, 307 (I), 311 (II) (129 SCt 2527, 174 LE2d 314) (2009) (sworn certificates of state crime lab analysts admitted into evidence to prove that material seized by police was contraband were testimonial; thus, defendant's confrontation rights were violated when the analysts who wrote the certificates did not testify in person at trial). One year later, in a case challenging the admissibility of expert testimony, the Supreme Court of Georgia recognized the holding in *Bullcoming*, but ruled that *Bullcoming* does not compel the exclusion of testimony from a substitute witness who "is a supervisor, *reviewer*, or someone else with a personal, albeit limited, connection to the scientific test at issue." (Punctuation and citation omitted; emphasis supplied.) *Disharoon v. State*, 291 Ga. 45, 48 (727 SE2d 465) (2012). See also *Leger v. State*, 291 Ga. 584, 592 (5) (732 SE2d 53) (2012) (scientist who did not personally perform DNA tests, but supervised worker who did, interpreted worker's results, and wrote lab report could testify at trial); *Thomas v. State*, 342 Ga. App. 310, 314 (2) (803 SE2d 131) (2017) (second chemist who did not personally perform drug identification tests, but reached an independent conclusion and interpreted procedures and analysis performed by first chemist who was unavailable to testify at trial, could testify at trial); *Estrada v. State*, 319 Ga. App.

8

762, 765-766 (3) (738 SE2d 344) (2013) (analyst who performed lab testing was unavailable, but supervisor could testify because he had reviewed analyst's work to determine whether it had been performed correctly and whether he agreed with it). Indeed, Georgia courts "have consistently held that the Confrontation Clause does not require the analyst who actually completed the forensic testing used against a defendant to testify at trial." (Citation and punctuation omitted.) *Leger*, 291 Ga. at 592 (5).

In this case, the forensic biologist testified about the DNA report she prepared on the sexual assault kit and confirmed that she participated in the preparation of the DNA report on the other tested items, which was prepared by a second analyst. As set out above, the forensic biologist explained that she conducted a peer review of the second analyst's report to ensure that the analyst followed policies and procedures, examined the analyst's notes and results, evaluated the steps taken by the second analyst to reach her conclusion, and reached an independent conclusion. The forensic biologist explained how a conclusion was reached for the DNA profiles on the items tested, and testified that if something had been wrong with the analyst's notes, the DNA report would not have been released. During cross examination, defense counsel submitted into evidence the notes and data relied on by the analyst and

9

forensic biologist in reaching their independent conclusions, and questioned the forensic biologist about those materials. Given these circumstances, we do not find the forensic biologist's testimony to be the sort of "surrogate testimony" inadmissible under *Bullcoming*. See *Thomas*, 342 Ga. App. at 314.

(b) *Report*. Because the analyst's DNA report (State's Exhibit 24) was cumulative of the forensic biologist's properly admitted testimony, its admission was harmless and we find no merit in Sanchious' challenge in this regard. See *Brown v. State*, 288 Ga. 404, 408 (3) (703 SE2d 624) (2010) (admission of hearsay is harmless where it is cumulative of other properly-admitted evidence); *Dennis v. State*, 158 Ga. App. 142, 144 (4) (279 SE2d 275) (1981) (same).

2. Sanchious contends that he received ineffective assistance of counsel at trial, asserting that his trial counsel's performance was deficient in a number of ways. As an initial matter, we note that Sanchious has asserted what appears to be sub-categories within his enumeration of error regarding ineffective assistance of counsel. These subcategories concern the trial court's error in admitting the evidence, failing to give a limiting instruction, and sending the DNA report out with the jury during their deliberations. An examination of his arguments within each of these sub-categories, however, show that he attempts to relate each to ineffective assistance of

counsel. We will therefore consider them only in the context of an ineffective assistance of counsel claim.

In order to succeed on this claim, Sanchious

must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. *Strickland v. Washington*, 466 U. S. 668 (104 SCT 2052, 80 LE2d 674) (1984). If an appellant fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. Id. at 697 (IV). In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.

(Citations and punctuation omitted.) *Baugh v. State*, 293 Ga. 52, 54 (2) (743 SE2d 407) (2013). "There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. The reasonableness of the conduct is viewed at the time of trial and under the circumstances of the case." (Citation, punctuation, and footnote omitted.) *Walker v. State*, 329 Ga. App. 369, 373 (3) (765 SE2d 599) (2014). "Moreover, a tactical or strategic decision made by counsel cannot form a basis for ineffective assistance of counsel unless it was so patently unreasonable that no competent attorney would have chosen it." (Citation

11

and punctuation omitted.) *McNair v. State*, 296 Ga. 181, 183 (2) (766 SE2d 45) (2014).

(a) Sanchious first asserts that his trial counsel was ineffective for failing to articulate all of the applicable objections to the admission of the forensic biologist's testimony and the analyst's DNA report (State's Exhibit 24). In this regard, Sanchious argues that the report and the testimony constituted inadmissible hearsay and violated his right of confrontation because the forensic biologist did not actually conduct the DNA testing on the panties and the comforter. Sanchious' claim of ineffectiveness in this regard fails for several reasons.

First, as set out above, trial counsel did object on grounds of hearsay. Thus, Sanchious' claim that trial counsel was ineffective for failing to object on this ground fails. Second, as explained in Division 1, supra, the evidence was not inadmissible "surrogate testimony." See *Disharoon*, 291 Ga. at 48. It follows then, that Sanchious' confrontation rights were not violated. Therefore, trial counsel's failure to object on this ground did not amount to ineffective assistance of counsel. See *Naji v. State*, 300 Ga. 659, 664 (3) (797 SE2d 916) (2017) (where testimony was ruled admissible, "trial counsel's failure to make a meritless objection cannot constitute evidence of ineffective assistance") (citation and punctuation omitted).

Third, trial counsel specifically testified that he strategically chose to allow admission of the report, waiving any objection to it going out with the jury during deliberations, because it supported his theory of DNA transfer. During the motion for new trial hearing, the State questioned trial counsel about this strategy as follows:

> [State]: Going into this trial you did have a strategy, correct?
> [Counsel]: Yes.
> [State]: Did part of that strategy involve the information that there were three DNA profiles on the underwear?
> [Counsel]: Yes.
> [State]: And did part of that strategy involve suggesting that there may be another reason for those three DNA profiles to be on evidence?
> [Counsel]: Yes.
> [State]: In fact, did that strategy assume that there was some exculpatory nature to the fact that there were three DNA profiles on that evidence?
> [Counsel]: Yes.
> [State]: Okay. Did some of the facts that — did that theory that there were the three DNA profiles tending to exonerate this defendant, was that part of the reason that you decided that the jury should see the reports?
> [Counsel]: Yes.
> [State]: Is that why you in fact, you rather than the State[,] were the first to suggest the reports go back to the jury?
> [Counsel]: Yes.
> [State]: So it was actually a strategic decision on your part to do that?
> [Counsel]: Yes.
> . . .
>
> [State]: And in fact you wanted Exhibits 22 through 24 to back with the jury because they advanced your transfer theory and your theory of the three, the three DNA profiles?
> [Counsel]: Correct.
> [State]: So that was actually part of your trial strategy to allow that?

[Counsel]: Yes.

[State]: Okay. So while you would prefer that no DNA evidence came in, once the [c]ourt overruled your objection it was helpful for the jurors to view that, in your opinion?

[Counsel]: Yes.

[State]: And in fact, you did get multiple acquittals on this case as well; is that correct?

[Counsel]: Correct.

[State]: The defendant was actually acquitted of five counts; is that correct?

[Counsel]: Correct.

"Trial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *McNair*, 296 Ga. at 184 (2) (b). Here, Sanchious has not shown that trial counsel's decision with regard to the DNA evidence was patently unreasonable and a decision that no competent attorney would have made. In fact, on appeal — and during the motion for new trial hearing — Sanchious further advances trial counsel's DNA transfer strategy by suggesting that counsel should have hired an expert to explain DNA transfer. See infra, Division 2 (d). Further, the admission of the evidence could not have created a reasonable probability that the outcome of the trial would have been different in light of the victim's testimony at trial and the medical evidence of the victim's injuries which were consistent with her version of

14

events. We find no merit in Sanchious' claim that counsel was ineffective for failing to articulate all of the applicable objections to the admission of the forensic biologist's testimony and the analyst's DNA report.

In a related allegation, Sanchious claims that his trial counsel was ineffective for failing to point out to the trial court that the facts and data underlying the report should have been excluded by the balancing test of OCGA § 24-7-703 because their probative value was substantially outweighed by their prejudicial effect. We find this argument meritless because it flies in the face of trial counsel's trial strategy. As set out above, trial counsel tendered the notes and data underlying the report during his cross examination of the forensic biologist and also testified during the motion for new trial hearing that he made the strategic decision to send the documents back with the jury because they helped to advance Sanchious' theory of the case, i.e., DNA transfer. "[A]s a matter of law, strategic decisions do not amount to ineffective assistance of counsel." *Sanders v. State*, 253 Ga. App. 380, 381 (559 SE2d 122) (2002).

(b) Sanchious next asserts that his trial counsel was ineffective for failing to request a limiting instruction explaining to the jury that the testimony and the report could not be relied upon as substantive evidence. Because the evidence was not

15

inadmissible, however, a limiting instruction was not required. See *Kitchens v. State*, 235 Ga. App. 349, 352 (1) (509 SE2d 391) (1998) (because co-conspirators' statements were admissible under hearsay exception and directly relevant to charges for which defendants were on trial, limiting instruction was not necessary). It follows that "trial counsel cannot be faulted for not requesting a jury charge which was not authorized." *Moore v. State*, 278 Ga. 397, 400 (2) (b) (603 SE2d 228) (2004). In any event, we note that the trial court charged the jury that it was "not required to accept the testimony of any witness, expert or otherwise. The testimony of an expert, like that of all witnesses, is to be given only such weight and credit as you think it is properly entitled to receive."

(c) Sanchious next asserts that his trial counsel was ineffective for allowing the DNA report to go back with the jury and agreeing to waive any continuing witness objection. Sanchious contends that since the report was inadmissible, the jury should not have been permitted to consider it during deliberations. According to Sanchious, by waiving the continuing witness objection, trial counsel unintentionally and ineffectively waived his previous hearsay objection. As ruled above, however, the report was cumulative of the forensic biologist's testimony. But, even if it was not,

16

as explained in Division 2 (a), supra, trial counsel's decision in this regard constituted reasonable trial strategy, and therefore, was not ineffective assistance.

(d) Sanchious last asserts that his trial counsel was ineffective for failing to call a DNA expert to testify about DNA transfer, Sanchious' sole defense. "The decision on whether to call an expert witness is one of trial strategy, and we will not find ineffectiveness if counsel's strategy and tactics were reasonable at the time." *Bharadia v. State*, 282 Ga. App. 556, 559 (6) (a) (639 SE2d 545) (2006).

At the motion for new trial hearing, Sanchious called an expert in forensic DNA analysis to testify. The expert testified that it is possible for DNA and bodily fluids to be transferred from one item of clothing to another. As for whether bodily fluids and DNA can be transferred in the washing machine, the expert testified that "studies have shown that spermatozoa can be picked up on items that were otherwise clean." While the expert opined that it is possible that the serological findings on the comforter could have resulted from the transfer of Sanchious' seminal fluid from another article of clothing, the expert conceded that it was also possible that Sanchious' seminal fluid on the victim's panties resulted from "the way that the victim said it was done." The expert testified that there was a small amount of seminal fluid on the underwear, and "very little sperm" on the comforter. The expert testified

17

that based on what she had been told by appellate counsel about the laundry in the victim's house, it is possible that the victim put on the mother's dirty underwear which would explain the three DNA profiles identified on the victim's panties.

When trial counsel testified at the motion for new trial hearing, he explained his defense theory of transferred DNA, and confirmed that he was aware of the possibility that semen can remain on an article of clothing even after it has been washed and/or that it can transfer to other articles of clothing. Trial counsel did not consider hiring an expert because he succeeding in getting several of the State's witnesses to admit on cross examination that transfer was a possibility. He further explained that: "In my thinking I guess the theory of transfer is so basic that I would not need an expert to determine and explain [it]. I don't know what the expert would have added to that that I could not have gotten out either through witness testimony or through the experts that were there." He also asked the defendant about the possibility of transfer during direct examination and was otherwise able to advance the theory when the mother admitted that the children sometimes brought the comforter into her room and lay it on her bed. While he argued in closing that the DNA transferred from the comforter after it was in the mother's bedroom to the children's bedroom, counsel explained that he could not "explain away" the mother's

testimony that the comforter was never in the bed when she had sex with Sanchious. At the conclusion of his testimony, trial counsel noted that after listening to the testimony of the proffered DNA expert, he did not believe an expert would have made much of a difference at trial.

The record shows that trial counsel questioned the forensic biologist about the possibility of DNA transfer, and confirmed with the GBI serologist that there is no test to determine "how, when or where" the seminal fluid or semen was placed on the evidence being tested. He also implied from questioning of the victim's mother that DNA could have transferred from the bed where she had sex with Sanchious to the red comforter that her children sometimes laid on the bed. Finally, Sanchious himself testified that he and the victim's mother had sex in many rooms of the home, that the red comforter came from the bed on which he slept with the victim's mother, and that the family had been without a washing machine for three weeks and that clothes had piled up as a result. In this case, the theory of DNA transfer was effectively drawn out in the cross-examination of the witnesses and in the questioning of Sanchious, and during closing arguments according to trial counsel's testimony during the motion for new trial. Consistent with the forensic biologist's testimony at trial, the expert confirmed that transfer was a possibility, but conceded the ultimate conclusion, that

Sanchious' DNA was present on the victim's panties because Sanchious ejaculated after anally penetrating the victim. Because Sanchious has failed to show that the proffered expert's testimony was any different or more favorable than the testimony defense counsel elicited from the witnesses at trial, he cannot establish that his defense was prejudiced by counsel's failure to call the expert. Accordingly, his claim of ineffective assistance fails. See, e.g., *Stripling v. State*, 304 Ga. 131, 139 (3) (816 SE2d 663) (2018); *Cobb v. State*, 348 Ga. App. 210, 215 (2) (b) (820 SE2d 241) (2018) (failure to call expert witness not deficient performance where trial counsel obtained on cross-examination information similar to that proffered by the expert).[2]

*Judgment affirmed. Barnes, P. J., and Mercier, J., concur.*

---

[2] In reaching our conclusion that Sanchious' trial counsel did not render ineffective assistance, we note further that his acquittal on the charges of rape, statutory rape, aggravated sodomy, aggravated child molestation, and tampering with evidence "is a relevant factor which strongly supports the conclusion that the assistance rendered by the attorney fell within that broad range of reasonably effective assistance." (Citations and punctuation omitted.) *Moon v. State*, 288 Ga. 508, 516 (9) (705 SE2d 649) (2011).