**FIRST DIVISION**
**BARNES, P. J.,**
**MERCIER and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS
COURT. ALL FILINGS MUST BE SUBMITTED WITHIN
THE TIMES SET BY OUR COURT RULES.*

**June 4, 2021**

# In the Court of Appeals of Georgia

A19A1499. SANCHIOUS v. THE STATE.

BROWN, Judge.

In *Sanchious v. State*, 351 Ga. App. 611 (831 SE2d 843) (2019) ("*Sanchious I*"), we affirmed the conviction of Christopher Sanchious for three counts of aggravated child molestation, two counts of child molestation, and one count each of aggravated sodomy and sexual battery involving his girlfriend's 12-year-old daughter.[1] On appeal, Sanchious challenged the trial court's admission of a DNA report and expert testimony regarding the analysis of that report, arguing that they constituted inadmissible hearsay. Sanchious also argued that counsel was constitutionally ineffective for, among other reasons, failing to object to the report

---

[1] The jury acquitted Sanchious of other charges of rape, statutory rape, aggravated sodomy, aggravated child molestation, and tampering with evidence.

and testimony on Confrontation Clause grounds. We rejected Sanchious' challenges. In Division 1 (a) of that opinion, we concluded that the trial court did not abuse its discretion in admitting the expert testimony under *Bullcoming v. New Mexico*, 564 U. S. 647 (131 SCt 2705, 180 LE2d 610) (2011). *Sanchious I*, 351 Ga. App. at 615-616 (1) (a). Finding that we analyzed the merits of a Confrontation Clause objection rather than the preserved hearsay objection, the Supreme Court of Georgia granted Sanchious' petition for certiorari, vacated our opinion, and remanded to this Court "to examine the hearsay claims Sanchious presented on appeal and then to reconsider any other claims preserved for appeal to the extent necessary." *Sanchious v. State*, 309 Ga. 580, 582 (847 SE2d 166) (2020) ("*Sanchious II*"). Accordingly, for purposes of clarity, we vacate the entirety of *Sanchious I*, and will provide an analysis of all of Sanchious' claims in one cohesive opinion. On remand, we again affirm Sanchious' convictions for the reasons set forth below.

"Following a criminal conviction, the defendant is no longer presumed innocent, and we view the evidence in the light most favorable to sustain the verdict." (Citation and punctuation omitted.) *Robinson v. State*, 342 Ga. App. 624, 625 (805 SE2d 103) (2017). So viewed, the evidence showed that Sanchious lived with the victim, the victim's mother, and the victim's brother and sister. On October 14, 2014,

2

the victim was asleep in a bedroom of her home on top of a red comforter, when Sanchious came in, pulled down the victim's "night pants," and "put his penis in [her] butt." She felt something "going in and out of her butthole" and said her pants smelled like "sour milk" when Sanchious was done. The victim went to the bathroom afterward and noticed that her pants were wet and that "the wet look[ed] [w]hite." The victim was afraid to tell her mother in person, so she wrote a note and left it on the ironing board telling her mother that she "can't take it anymore" and that Sanchious "need[s] to leave" because "he is put[t]ing his hand[s] on [her] the wrong way . . . [and she] think[s] that is called rape." At the end of the note, the victim wrote "help me" because she was scared it might happen again. The mother did not see the note until later that evening when the victim handed it to her. The mother confronted Sanchious, and he denied touching the victim. The mother took the victim to the hospital and then to police. The mother reported to police that Sanchious "anal[ly] penetrat[ed]" the victim, after which the victim underwent a forensic medical exam. In addition to anal penetration, the victim testified at trial that in the summer of that same year, Sanchious licked her vagina. During the forensic medical exam, the victim reported the anal penetration and also advised medical personnel that Sanchious placed his penis in her vagina and her mouth, and put his finger in her vagina. During

3

the forensic interview, the victim reported all of the above and also stated that Sanchious put his finger down her pants and touched her vagina outside of her underwear. She also reported that in September of the same year, he put his penis in her vagina.

The victim's younger sister testified at trial that sometime in October 2014, the victim told her that Sanchious was doing "stuff to [the victim] while she was asleep" on the floor of the sister's room. The sister stated that the victim was sleeping on top of a purple cover and under a red cover that had been given to the sister by her godmother. The sister never saw anything because she was asleep and told the victim to tell their mother immediately and "she will handle it."

The medical exam of the victim conducted in the early morning hours of October 16, 2014, along with the administration of a sexual assault kit, revealed a "healed tear" to her hymen, swelling in her vagina, and a recent abrasion, or bruising on the cervix, all consistent with "insertion of a penis." The exam also revealed a recent injury to the victim's anus, one tear at the top and another toward the bottom, consistent with insertion of a penis. The nurse who conducted the exam testified that the victim had what appeared to be seminal fluid in her anus. The nurse handed over to police both the sexual assault kit and the victim's underwear.

4

Sometime after 1:00 a.m. on October 16, 2014, and following the medical exam, officers accompanied the victim and her mother back to their home where they discovered Sanchious asleep in the mother's bed. Officers recovered two comforters from the victim's sister's room, one red and one purple, as well as the victim's night pants, which were warm from having just been "run through" the dryer because Sanchious had been doing laundry. Police collected a saliva sample from Sanchious, and sent the following items to the GBI for testing: the purple comforter, cuttings from the red comforter, the victim's underwear, and the sexual assault kit.

A GBI serologist testified that the victim's underwear tested positive for seminal fluid, and that a cutting from the red comforter tested positive for sperm and seminal fluid. Both items were sent for DNA testing. The serologist testified that it was unlikely for fluid to be detected on something that had been washed.

GBI forensic biologist, Karen Turpin, testified at trial about the DNA testing performed on the victim's sexual assault kit, her underwear, and the cuttings from the red comforter. She explained that as part of her duties at the GBI, she conducts DNA testing, but also performs peer reviews of DNA typing analysis reports, meaning that she "examine[s] all the notes and results in the report of an analyst, and [that she has] to come to the same conclusions." The purpose of peer review is "[t]o ensure that the

analyst has followed policies and procedures, and that the results are correct and reliable" with the peer reviewer "actually evaluat[ing] the [analyst's] conclusion, or the steps taken to reach that conclusion." Turpin testified that she personally tested the sexual assault kit in this case, but that forensic biologist Dr. Tesheka Wortham, who did not testify at trial, tested the underwear and red comforter subject to Turpin's peer review. The sexual assault kit tested negative for the presence of male DNA, while the cuttings from the red comforter contained the DNA profiles matching the profiles of the victim and Sanchious. The victim's underwear also tested positive for the presence of DNA, and contained the DNA profiles of three individuals, including the victim, Sanchious, and an unknown person. One fraction of the DNA extracted from the underwear came from sperm cells and a second came from non-sperm cells. The DNA of the unknown person and the victim were both located in the non-sperm cells, while Sanchious' DNA was found in the "sperm fraction." Turpin testified that "[t]he frequency, or the statistic, of the DNA markers shared between . . . Sanchious and the DNA obtained . . . from the underwear and the cutting recovered from the comforter is approximately one in one hundred quadrillion in the African American population, and one in five hundred quadrillion in the Caucasian population." Turpin concluded with "reasonable scientific certainty" that the DNA obtained from the

6

underwear and the comforter matched Sanchious or his identical twin, and testified that Dr. Wortham's "testing was done and followed according to policy and procedure." Turpin explained that she had peer reviewed Dr. Wortham's report "[t]o ensure that the analyst ha[d] followed policies and procedures, and that the results [were] correct and reliable."

When the State sought to introduce Dr. Wortham's DNA report and began to elicit the above testimony from Turpin about the report, Sanchious objected on hearsay grounds. The trial court overruled the hearsay objection to the report and admitted Dr. Wortham's DNA report on the underwear and the comforter (State's Exhibit 24) as well as Turpin's DNA report on the sexual assault kit (State's Exhibit 22). On cross-examination, defense counsel asked Turpin about the possibility of secondary transfer, and she confirmed that she reviews that possibility. Defense counsel also questioned Turpin about the notes and data compiled by Dr. Wortham during her testing, and submitted those materials into evidence.

Sanchious testified at trial, denying that he ever touched the victim inappropriately. Sanchious could not explain why his semen was on the victim's underwear, and claimed that the red comforter on which his semen was found was the comforter under which he and the victim's mother slept and had sex. The victim's

7

mother testified that the red comforter was never on her bed or in her bedroom, and that she never had sex on or under the red comforter; it was in the victim's sister's room and was a gift from a friend. On cross-examination, the mother clarified that her children would sometimes bring the red comforter into her room, place it on her bed, lie on the comforter, and then take it out of the room, but the children never left the blanket in her room permanently.

1. In two related enumerations of error, Sanchious contends that the trial court abused its discretion in admitting, over objection, Dr. Wortham's DNA report and Turpin's conclusions drawn after her review of the report because they constituted inadmissible hearsay. We disagree.

(a) *Turpin's testimony.* Sanchious did not object to Turpin's testimony at trial; he objected only to admission of Dr. Wortham's report and the trial court overruled that objection. Accordingly, we review this claim for plain error only. OCGA § 24-1-103 (a), (d). See *Hambrick v. State*, 353 Ga. App. 666, 677 (4) (839 SE2d 664) (2020).

> To establish plain error, [Sanchious] must show an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather

than subject to reasonable dispute. Third, the error must have affected [Sanchious'] substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Hambrick*, 353 Ga. App. at 677 (4). Sanchious has not established plain error.

"The first step requires us to consider whether it was obvious error to admit the evidence." *Sullins v. State*, 347 Ga. App. 628, 632 (1) (820 SE2d 468) (2018). It is well established that "[a]n expert may base her opinions on data gathered by others." *Watkins v. State*, 285 Ga. 355, 358 (2) (676 SE2d 196) (2009). In *Watkins*, our Supreme Court addressed a similar situation, albeit in the context of a claim that trial counsel rendered ineffective assistance, and concluded that the trial court properly admitted the testimony. 285 Ga. at 358 (2). In that case, GBI toxicologist Leigh Ann Champion testified about the victim's blood alcohol level at the time of her death. As explained by the Supreme Court:

The blood alcohol testing was originally performed by Della Smith, and that testing was later subjected to a peer review by Champion, who reviewed the testing procedures and data gathered by Smith for accuracy. By the time of trial, Smith was no longer employed by the

9

GBI, so Champion testified about the blood test and the results of her peer review. Watkins argues that this testimony was improper because Champion was acting as a mere conduit for Smith's hearsay findings. The record does not support this contention. Rather than being a mere conduit for Smith's findings, Champion reviewed the data and testing procedures to determine the accuracy of Smith's report. An expert may base her opinions on data gathered by others. As a result, Champion's testimony was properly admitted into evidence. . . .

(Citation and punctuation omitted.) Id.

We find similarly in this case. Here, just like in *Watkins*, Dr. Wortham's DNA testing and analysis of the victim's underwear and the cuttings from the red comforter, as well as her report, were subject to a peer review by Turpin, who examined Dr. Wortham's entire case file and notes for accuracy; evaluated the steps taken by Dr. Wortham to reach her conclusion; and reached a conclusion identical to — but independent of — Dr. Wortham's conclusion, i.e., to a "reasonable scientific certainty," the DNA obtained from the underwear and comforter matched Sanchious or his identical twin. Because Turpin "reviewed the data and testing procedures to determine the accuracy of [Dr. Wortham's] report," her testimony was not "a mere conduit" for Dr. Wortham's hearsay findings. Accordingly, the trial court did not commit any error, much less plain error in admitting Turpin's testimony into

10

evidence. See *Watkins*, 285 Ga. at 358 (2). See also *Rector v. State*, 285 Ga. 714, 715 (4) (681 SE2d 157) (2009) (trial court did not err in allowing toxicologist to testify about toxicology report relating to deceased victim that had been prepared by another doctor).[2]

(b) *Wortham's DNA Report.* As for admission of Dr. Wortham's report (State's Exhibit 24), because it was cumulative of Turpin's properly admitted testimony, its admission was harmless, and we find no merit in Sanchious' challenge in this regard. See *Herrera v. State*, 288 Ga. 231, 234 (4) (702 SE2d 854) (2010) ("[i]n view of the lab supervisor's testimony [about contents of lab report], any error in admission of the lab report itself was harmless beyond a reasonable doubt").

2. Sanchious contends that he received ineffective assistance of counsel at trial, asserting that his trial counsel's performance was deficient in a number of ways. As an initial matter, we note that Sanchious has asserted what appears to be subcategories within his enumerations of error regarding ineffective assistance of counsel. These subcategories concern the trial court's error in admitting the evidence, failing to give a limiting instruction, and sending the DNA report out with the jury

---

[2] To the extent Sanchious argues that any testimony by Turpin about the contents of the report is likewise inadmissible, this claim is not supported by our review of Turpin's testimony as a whole.

11

during their deliberations. An examination of his arguments within each of these subcategories, however, shows that he attempts to relate each to ineffective assistance of counsel. We will therefore consider them only in the context of an ineffective assistance of counsel claim.

> In order to succeed on this claim, Sanchious
>
> must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). If an appellant fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. Id. at 697 (IV). In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.

(Citations and punctuation omitted.) *Baugh v. State*, 293 Ga. 52, 54 (2) (743 SE2d 407) (2013). "There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. The reasonableness of the conduct is viewed at the time of trial and under the circumstances of the case." (Citation and punctuation omitted.) *Walker v. State*, 329 Ga. App. 369, 373 (3) (765 SE2d 599) (2014). "Moreover, a tactical or strategic decision made by counsel cannot

12

form a basis for ineffective assistance of counsel unless it was so patently unreasonable that no competent attorney would have chosen it." (Citation and punctuation omitted.) *McNair v. State*, 296 Ga. 181, 183 (2) (766 SE2d 45) (2014).

*Turpin's Testimony*

(a) Sanchious contends that trial counsel should have objected to the admission of Turpin's testimony about Wortham's report and the DNA testing process on Confrontation Clause grounds. We disagree.

In *Bullcoming*, the United States Supreme Court addressed whether the prosecution may introduce into evidence a forensic laboratory report via the "surrogate testimony" of an analyst who did not sign the certification or personally conduct or observe the performance of the test reported in the certified lab report prepared by another analyst, and ruled that "it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." 564 U. S. at 657 (I) (C). See also *Melendez-Diaz v. Massachusetts*, 557 U. S. 305, 307 (I), 311 (II) (129 SCt 2527, 174 LE2d 314) (2009) (sworn certificates of state crime lab analysts admitted into evidence to prove that material seized by police was contraband were testimonial; thus, defendant's confrontation rights were violated when the analysts

13

who wrote the certificates did not testify in person at trial). One year later, in a case challenging the admissibility of expert testimony, the Supreme Court of Georgia recognized the holding in *Bullcoming*, but ruled that *Bullcoming* does not compel the exclusion of testimony from a substitute witness who "is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." (Citation and punctuation omitted.) *Disharoon v. State*, 291 Ga. 45, 48 (727 SE2d 465) (2012). See also *Leger v. State*, 291 Ga. 584, 592 (5) (732 SE2d 53) (2012) (scientist who did not personally perform DNA tests, but supervised worker who did, interpreted worker's results and wrote lab report could testify at trial); *Thomas v. State*, 342 Ga. App. 310, 314 (2) (803 SE2d 131) (2017) (second chemist who did not personally perform drug identification tests, but reached an independent conclusion and interpreted procedures and analysis performed by first chemist who was unavailable to testify at trial, could testify at trial); *Estrada v. State*, 319 Ga. App. 762, 765-766 (3) (738 SE2d 344) (2013) (analyst who performed lab testing was unavailable, but supervisor could testify because he had reviewed analyst's work to determine whether it had been performed correctly and whether he agreed with it). Indeed, Georgia courts "have consistently held that the Confrontation Clause does not require the analyst who actually completed the forensic testing used against a

14

defendant to testify at trial." (Citation and punctuation omitted.) *Leger*, 291 Ga. at 592 (5).

In this case, Turpin testified about the DNA report she prepared on the sexual assault kit and confirmed that she participated in the preparation of the DNA report on the other tested items, which was prepared by Dr. Wortham. As set out above, Turpin explained that she conducted a peer review of Dr. Wortham's report to ensure that she followed policies and procedures, examined Dr. Wortham's notes and results, evaluated the steps taken by Dr. Wortham to reach her conclusion, and reached an independent conclusion. Turpin explained how a conclusion was reached for the DNA profiles on the items tested, and testified that if something had been wrong with Dr. Wortham's notes, the DNA report would not have been released. During cross-examination, defense counsel submitted into evidence the notes and data relied on by Dr. Wortham and Turpin in reaching their independent conclusions, and questioned Turpin about those materials. Given these circumstances, we do not find Turpin's testimony to be the sort of "surrogate testimony" inadmissible under *Bullcoming*. See *Thomas*, 342 Ga. App. at 314 (2). Accordingly, trial counsel was not ineffective for failing to raise a meritless challenge to its admission into evidence. See, e.g., *Sims v. State*, 281 Ga. 541, 543 (2) (640 SE2d 260) (2007) ("[s]ince the

testimony was admissible, an objection to it would have been without merit, and failure to make a meritless objection does not constitute ineffective assistance of counsel").

(b) Sanchious contends that counsel should have objected to the admission of Turpin's testimony about Dr. Wortham's report on hearsay grounds. Given our conclusion in Division 1 (a), supra, of this opinion that the testimony was properly admitted, "failure to make a meritless objection cannot support a claim of ineffective assistance." (Citation and punctuation omitted.) *Harris v. State*, 304 Ga. 652, 658 (2) (c) (821 SE2d 346) (2018). See also *Mendez v. State*, 327 Ga. App. 497, 499 (2) (759 SE2d 574) (2014) (objection on hearsay grounds would have been meritless).

(c) Sanchious contends that assuming Turpin's testimony about Wortham's report was "not offered for the truth of the matter asserted," counsel should have objected to its admission on grounds that it was irrelevant and not supported by personal knowledge. We find this contention unavailing. As we concluded in Division 1 (a), Turpin's testimony did not constitute inadmissible hearsay. Therefore, it was properly admitted for the truth of the matter asserted, and we find no merit in this contingent ground of ineffective assistance of counsel.

(d) Sanchious contends that if Turpin's testimony was admitted only to aid the jury in understanding her expert opinion pursuant to OCGA § 24-7-703,[3] counsel should have objected on the ground that its probative value was substantially outweighed by its prejudicial effect. This enumeration of error, which appears to track a similar enumeration of error Sanchious makes with regard to Dr. Wortham's report, see infra at Division 2 (h), consists of only two sentences and makes little sense as stated.[4] Sanchious appears to be arguing that Turpin lacked personal knowledge that

[3] OCGA § 24-7-703 provides as follows:

The facts or data in the particular proceeding upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, such facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Such facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference *unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.*

(Emphasis supplied.)

[4] The enumeration of error reads, in its entirety, as follows: "[i]f the surrogate scientist's testimony has any probative value and if admitted only to aid the jury in understanding her expert opinion pursuant to OCGA § 24-7-703, that value was

17

Dr. Wortham actually tested the items related to the case. But OCGA § 24-7-703 does not require that an expert have personal knowledge. Indeed, the rule allows an expert to base their opinion on facts and data reasonably relied upon by experts in their particular field. See *Smith v. State*, 307 Ga. 106, 116 (834 SE2d 750) (2019). See also *Williams v. Illinois*, 567 U. S. 50, 67 (II) (B) (132 SCt 2221, 183 LE2d 89) (2012) (plurality opinion) ("[i]t has long been accepted that an expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks first-hand knowledge of those facts"). Accordingly, there is no merit to this contention.

(e) Sanchious next asserts that if the testimony was admitted pursuant to OCGA § 24-7-703, trial counsel was ineffective for failing to request a limiting instruction explaining to the jury that the testimony regarding the testing process and conclusion contained in Dr. Wortham's report could not be relied upon as substantive evidence. Because Turpin's testimony about her own conclusions after her review of "all the notes and results in the report" was admissible generally, no limiting instruction was warranted.

*Wortham's Report*

---

substantially outweighed by its prejudicial effect."

18

(f) Sanchious contends that trial counsel should have objected to the admission of Dr. Wortham's DNA report (State's Exhibit 24) on all of the same grounds he asserts in relation to Turpin's testimony, though he additionally claims that counsel should have made a lack of foundation objection. We disagree. Even if trial counsel was deficient in failing to object to admission of the report on all the grounds asserted, the report was cumulative of Turpin's properly admitted testimony. See *Brown v. State*, 288 Ga. 404, 408 (3) (703 SE2d 624) (2010) (admission of hearsay is harmless where it is cumulative of other properly admitted evidence); *Dennis v. State*, 158 Ga. App. 142, 144 (4) (279 SE2d 275) (1981) (same). Accordingly, Sanchious cannot show that he was prejudiced by trial counsel's failure to object. See, e.g., *Williams v. State*, 292 Ga. 844, 848 (3) (a) (742 SE2d 445) ( 2013) (because records were cumulative of other testimony, defendant unable to show prejudice).

Additionally, given the strong evidence of Sanchious' guilt, including the victim's testimony at trial and the medical evidence of the victim's injuries which were consistent with her version of events, Sanchious cannot show that he was prejudiced by counsel's failure to object, on the basis of lack of foundation, to admission of Dr. Wortham's report.

(g) As for Sanchious' specific claims that counsel should not have permitted the report to go back with the jury during deliberations, we find this claim equally unconvincing. Trial counsel testified at the motion for new trial hearing that he strategically chose to allow the report to go back with the jury during deliberations because it supported his theory of DNA transfer. In fact, it was trial counsel — and not the State — that first suggested the report go back to the jury because it "advanced [counsel's] transfer theory and [his] theory of . . . the three DNA profiles." "Trial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *McNair*, 296 Ga. at 184 (2) (b). Here, Sanchious has not shown that trial counsel's decision with regard to the DNA report was patently unreasonable and a decision that no competent attorney would have made. In fact, on appeal — and during the motion for new trial hearing — Sanchious further advances trial counsel's DNA transfer strategy by suggesting that counsel should have hired an expert to explain DNA transfer. See Division 2 (j), infra.

(h) Sanchious next asserts that his trial counsel was ineffective for failing to request a limiting instruction explaining to the jury that the report could not be relied

upon as substantive evidence. Because the report was cumulative of Turpin's testimony, and given the strength of the evidence, Sanchious cannot show a reasonable probability that the outcome would have been different had a limiting instruction been given.

(i) In parallel with his contention discussed in Division 2 (d), Sanchious contends that "if the report has any probative value and if admitted only to aid the jury in understanding [Turpin's] opinion pursuant to OCGA § 24-7-703," counsel should have objected on the ground that its value was substantially outweighed by its prejudicial effect. Pretermitting the fact that the report and associated notes supported Sanchious' defense theory, as discussed above, the admission of Dr. Wortham's report was harmless given the strength of the evidence against Sanchious. "As such, even if we assume that trial counsel performed deficiently in this regard, we cannot say that, but for any possible error by trial counsel, the result of the proceeding would have been different." *Jackson v. State*, 306 Ga. 266, 276 (5) (b) (830 SE2d 99) (2019).

### *DNA Expert*

(j) Sanchious last asserts that his trial counsel was ineffective for failing to call a DNA expert to testify about DNA transfer, Sanchious' sole defense. "The decision

21

on whether to call an expert witness is one of trial strategy, and we will not find ineffectiveness if counsel's strategy and tactics were reasonable at the time." *Bharadia v. State*, 282 Ga. App. 556, 559 (6) (a) (639 SE2d 545) (2006).

At the motion for new trial hearing, Sanchious called an expert in forensic DNA analysis to testify. The expert testified that it is possible for DNA and bodily fluids to be transferred from one item of clothing to another. As for whether bodily fluids and DNA can be transferred in the washing machine, the expert testified that "studies have shown that spermatozoa can be picked up on items that were otherwise clean." While the expert opined that it is possible that the serological findings on the comforter could have resulted from the transfer of Sanchious' seminal fluid from another article of clothing, the expert conceded that it was also possible that Sanchious' seminal fluid on the victim's panties resulted from "the way that the victim said it was done." The expert testified that there was a small amount of seminal fluid on the underwear, and "very little sperm" on the comforter. The expert testified that based on what she had been told by appellate counsel about the laundry in the victim's house, it is possible that the victim put on the mother's dirty underwear which would explain the three DNA profiles identified on the victim's panties.

22

When trial counsel testified at the motion for new trial hearing, he explained his defense theory of transferred DNA, and confirmed that he was aware of the possibility that semen can remain on an article of clothing even after it has been washed and/or that it can transfer to other articles of clothing. Trial counsel did not consider hiring an expert because he succeeded in getting several of the State's witnesses to admit on cross-examination that transfer was a possibility. He further explained: "In my thinking I guess the theory of transfer is so basic that I would not need an expert to determine and explain [it]. I don't know what the expert would have added to that that I could not have gotten out either through witness testimony or through the experts that were there." He also asked Sanchious about the possibility of transfer during direct examination and was otherwise able to advance the theory when the mother admitted that the children sometimes brought the comforter into her room and laid it on her bed. While he argued in closing that the DNA transferred from the comforter to the underwear after it was in the mother's bedroom and moved to the children's bedroom, counsel explained that he could not "explain away" the mother's testimony that the comforter was never in the bed when she had sex with Sanchious. At the conclusion of his testimony, trial counsel noted that after listening to the

testimony of the proffered DNA expert, he did not believe an expert would have made much of a difference at trial.

The record shows that trial counsel questioned Turpin about the possibility of DNA transfer and confirmed with the GBI serologist that there is no test to determine "how, when or where" the seminal fluid or semen was placed on the evidence being tested. He also implied from questioning the victim's mother that DNA could have transferred from the bed where she had sex with Sanchious to the red comforter that her children sometimes laid on the bed. Finally, Sanchious himself testified that he and the victim's mother had sex in many rooms of the home, that the red comforter came from the bed on which he slept with the victim's mother, and that the family had been without a washing machine for three weeks and that clothes had piled up as a result. In this case, the theory of DNA transfer was effectively drawn out in the cross-examination of the witnesses and in the questioning of Sanchious, and during closing arguments according to trial counsel's testimony during the motion for new trial. Consistent with Turpin's testimony at trial, the expert confirmed that transfer was a possibility — but conceded the ultimate conclusion — that Sanchious' DNA was present on the victim's panties because Sanchious ejaculated after anally penetrating the victim. Because Sanchious has failed to show that the proffered

expert's testimony was any different or more favorable than the testimony defense counsel elicited from the witnesses at trial, he cannot establish that his defense was prejudiced by counsel's failure to call the expert. Accordingly, his claim of ineffective assistance fails. See, e.g., *Stripling v. State*, 304 Ga. 131, 139 (3) (b) (816 SE2d 663) (2018); *Cobb v. State*, 348 Ga. App. 210, 215 (2) (b) (820 SE2d 241) (2018) (failure to call expert witness not deficient performance where trial counsel obtained on cross-examination information similar to that proffered by the expert).[5]

*Judgment affirmed. Barnes, P. J., and Mercier, J., concur.*

---

[5] In reaching our conclusion that Sanchious' trial counsel did not render ineffective assistance, we note further that his acquittal on the charges of rape, statutory rape, aggravated sodomy, aggravated child molestation, and tampering with evidence "is a relevant factor which strongly supports the conclusion that the assistance rendered by the attorney fell within that broad range of reasonably effective assistance." (Citations and punctuation omitted.) *Moon v. State*, 288 Ga. 508, 516 (9) (705 SE2d 649) (2011). See also *Pierre v. State*, ___ Ga. App. ___ *2 (___ SE2d ___) (Case No. A21A0200, decided April 21, 2021).